**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____
                                    )
**MARK LALIBERTE,**                 )
    **Plaintiff**  )
                                    )
**V.**                              )    Civil Action
                                    )    No. 05-11224-MLW
**WOODS HOLE, MARTHA'S**            )
**VINEYARD AND NANTUCKET**          )
**STEAMSHIP AUTHORITY,**            )
    **Defendant**  )
_____)
                                    )
**BARRY BROOKS,**                   )
    **Plaintiff**  )
                                    )    Civil Action
**V.**                              )    No. 05-11861-MLW
                                    )
**WOODS HOLE, MARTHA'S**            )
**VINEYARD AND NANTUCKET**          )
**STEAMSHIP AUTHORITY,**            )
    **Defendant**  )
_____)

<u>**DEFENDANT'S TRIAL BRIEF**</u>

Now comes the defendant, Woods Hole, Martha's Vineyard & Nantucket Steamship Authority, in the above-entitled action, by and through its undersigned attorneys, Clinton & Muyzka, P.C., and respectfully submit its Trial Brief pursuant to the Procedural Order dated August 22, 2007.

I.    <u>STATEMENT OF THE CASE</u>

These consolidated cases arise out of an incident that occurred on August 4, 2003.  At that time, the

plaintiffs were serving onboard the M/V ISLANDER, which was owned and operated by the defendant, as Able Bodied Seamen.[1]  Before the vessel departed Woods Hole earlier that morning, the U.S. Coast Guard boarded for the purpose of performing a quarterly inspection.  As part of the quarterly inspection, the vessel's crewmembers were required to perform fire fighting and man-overboard drills.  The man-overboard drill would start by the U.S. Coast Guard deploying a dummy ("Oscar") over the side of the vessel.  The vessel performed a fire fighting drill enroute to Vineyard Haven.

Before the vessel departed Vineyard Haven, its crewmembers were prepared to perform a man-overboard drill.  The vessel has a Daily Muster List, which sets forth the positions of each crewmember during an emergency drill.  According to the Daily Muster List, the plaintiffs were assigned to the rescue boat.  Mr. LaLiberte was responsible for releasing the lines connecting to the rescue boat to the M/V ISLANDER, and Mr. Brooks was responsible for starting the rescue boat's outboard engine.[2]  There are three (3) lines connecting the vessel to the rescue boat: a main wire that lowers the rescue

---

[1] An Able Bodied Seaman (AB) is licensed by the U.S. Coast Guard.

[2] After the rescue boat was underway, Mr. LaLiberte would serve as lookout while Mr. Brooks navigated the boat towards Oscar.

boat into the water and two (2) painters (bow & stern).

The painters serve a dual purpose: they stabilize the rescue boat while it is being lowered into the water via the vessel's main deck (davit & winch) and they prevent the rescue boat from becoming perpendicular to the vessel once it is placed into the water. A crewmember on the vessel's forward main deck tenders the bow painter, and a crewmember on the vessel's aft main deck tenders the stern painter. These crewmembers will slack the painters accordingly as the vessel is being lowered into the water. The Master decides the appropriate time to lower the rescue boat, but the procedure is supervised by the Pilot on the main deck.

Shortly after the vessel departed Vineyard Haven, the U.S. Coast Guard deployed Oscar and the man-overboard drill commenced. The plaintiffs proceeded to the vessel's freight deck, donned their life jackets, and opened a porthole on the starboard side of the vessel. After the vessel stopped, the crewmembers on the main deck started to lower the rescue boat into the water. Once the rescue boat reached the water, the plaintiffs boarded the boat through the porthole on the freight deck via a Jacobs ladder. Mr. Brooks proceeded the boat's stern and attempted to start its outboard engine while Mr. LaLiberte

started to release the bow painter.[3]

Within several minutes, the vessel started heading astern. There was a communication breakdown between the Pilot and Master. The Master intended on switching pilothouses and navigating the vessel closer to Oscar, but did not verbally convey this information to the Pilot.[4] As a result, the rescue boat was lowered into the water without the Master's knowledge. In any event, water started to enter the rescue boat over its transom as a consequence of the vessel heading astern. The crewmembers on the main deck attempted to raise the rescue boat via the main wire, but this was unsuccessful. The rescue boat eventually became perpendicular to the vessel, lost its stability, and capsized.

The plaintiffs surfaced shortly thereafter and did not appear to be in distress. It should be noted that the rescue boat would not have capsized had Mr. LaLiberte released the main wire before releasing the bow painter. This is supported by the testimony of the defendant's liability expert. Nonetheless, the stern painter

---

[3] Up until this time, there was nothing unusual about the man-overboard drill. There was no confusion amongst the crewmembers. They were fully aware of their stations and corresponding responsibilities.
[4] The M/V ISLANDER has a forward and aft pilothouse. When the U.S. Coast Guard deployed Oscar off the vessel's stern, the Master was located in the forward pilothouse. He intended on switching the controls to the aft pilothouse and navigating the vessel closer to Oscar. Navigating the vessel from the aft pilothouse would provide him with better visibility of Oscar.

allegedly wrapped around Mr. Brooks' right ankle and
started to drag him through the water.  Photographs taken
at the time of the incident confirm that Mr. Brooks' life
jacket was not properly donned.  As a consequence, he was
submerged for an indeterminate amount of time.

By this time, Mr. LaLiberte had already boarded a
nearby vessel.  After observing the situation, he jumped
back into the water and started swimming towards Mr.
Brooks.  He eventually grabbed Mr. Brooks and was pulled
towards the nearby vessel via a life line.  After they
boarded the nearby vessel, Mr. LaLiberte successfully
performed CPR on Mr. Brooks.  Mr. LaLiberte has been
credited for saving Mr. Brooks' life, but he refuses to
take any responsibility for not properly performing his
duties and causing the rescue boat to capsize.  Mr.
LaLiberte was in the best position to avoid the incident
after the vessel started heading astern.

As a result of the incident, both plaintiffs alleged
Post-Traumatic Stress Syndrome (PTSD).  The seawater that
entered Mr. Brooks' lungs also caused an ongoing pulmonary
condition.  The psychiatrist that examined the plaintiffs
on the defendant's behalf (Dr. Ronald Schouten) believes
that Mr. Brooks is experiencing PTSD.  However, Dr.
Schouten does not believe that Mr. LaLiberte ever

experienced PTSD as a result of the incident.  There is overwhelming evidence that Mr. LaLiberte is embellishing his symptoms, if any, for financial gain.  He has been characterized as his fellow crewmembers and former girlfriend as a "scammer."

After the incident, the U.S. Coast Guard issued a Civil Penalty to the defendant for violating the provisions of 46 CFR §199.180(a)(b).  The defendant satisfied the $1,000.00 Civil Penalty.

II.  <u>ASSERTED CLAIMS & DEFENSES</u>

The plaintiffs have asserted claims for negligence under the Jones Act, and Unseaworthiness, Maintenance & Cure, and failure to pay Maintenance & Cure under the General Maritime Law.  The defendant has stipulated to a finding in favor of the plaintiffs on their Jones Act negligence and Unseaworthiness (Counts I & II) claims.  As a result, the only issues to be addressed at trial are the plaintiffs' comparative fault, Maintenance & Cure, and the nature and extent of damages.  There are several issues relating to the applicability of the Pennsylvania Rule, the impact of Section 53 of the Federal Employers Liability Act to the defendant's comparative fault defenses, and the Collateral Source Rule.

The defendant is submitting this brief in advance of trial to outline its positions on these issues.

II.   THE PENNSYLVANIA RULE DOES NOT APPLY TO CASES INVOLVING PERSONAL INJURIES.

Liability for collisions, allisions, and strandings under the General Maritime Law is based upon a finding of fault that caused or contributed to the occurrence.  "The standard of care against which fault is determined is derived from (1) general concepts of prudent seamanship and reasonable care; (2) statutory and regulatory rules governing the movement and management of vessels and other maritime structures; and (3) recognized customs and usages."  *Admiralty & Maritime Law, Thomas J. Schoenbaum §14-2 (4th Edition)*.  "The most frequent source of liability for collision and other marine casualty is the violation of a statute or regulation."  Id.[5]

The most important and pervasive presumption in admiralty collision law is the so-called Pennsylvania Rule.  This rule, as first established by the U.S. Supreme Court *in The S.S. Pennsylvania v. Troop, 86 U.S. (19 Wall.) 125, 22 Led. 148 (1873)*, holds that:

> "The liability for damages is upon the ship or ships whose fault caused the injury.  But when, as in this case, a ship at the time of a collision is in actual

---

[5] "A wide variety of statutes may be relevant.  The most important, however, are the rules concerning ship navigation, the so-called rules of the road."  Id.

> violation of a statutory rule intended to prevent
> collisions, it is no more than a reasonable
> presumption that the fault, if not the sole cause,
> was at least a contributory cause of the disaster.
> In such a case, the burden rests upon the ship of
> showing not merely that her fault might not have been
> one of the causes, or that it probably was not, but
> that it could not have been.  Such a rule is
> necessary to enforce obedience to the mandate of the
> statute." 86 U.S. at 136.

Under the rule, the defendant assumes the burden of
proving that its breach could not have caused plaintiff's
damages, once the plaintiff establishes both that the
defendant breached a statutory duty and that said breach
contributed to the plaintiff's injuries. *Poulis-Minott v.
Smith, 388 F.3d 354, 363 (1st Cir. 2004); Continental Grain
Co. v. Puerto Rico Maritime Shipping Authority, 972 F.2d
426, 436 (1st Cir. 1992).*  The Pennsylvania Rule does not
establish fault.  *Id.*

     As confirmed by the First Circuit, the Pennsylvania
Rule does not apply to cases involving the Jones Act or
Unseaworthiness under the General Maritime Law.  *Poulis-
Minott v. Smith, 388 F.3d 354, 366-67 (1st Cir. 2004)*
("[w]e have determined that it is inappropriate to apply
the Pennsylvania Rule to shift the burden of proving
necessary causation for a claim of Jones Act negligence or
unseaworthiness").[6]  The Pennsylvania Rule only applies to

---

[6] See also, *Willis v. Amerada Hess Corp., 379 F.3d 32, 45 (2nd Cir.
2004); Swan Crewboats, Inc. v. Phipps, 2002 WL 1733647* ("The court

cases involving collisions, allisions, strandings, and
sinkings.

The Pennsylvania Rule also does not apply because it
is a liability-based principle and the defendant has
conceded liability.  Finally, the rule does not apply
because the plaintiffs have not offered any evidence
establishing that the alleged statutory violation
contributed to the injuries they allegedly sustained.  The
burden of proof does not shift unless the plaintiff
establishes both that the defendant breached a statutory
duty and that said breach contributed to the plaintiff's
injuries.  *Poulis-Minott v. Smith, 388 F.3d 354, 363 (1st*
*Cir. 2004).*

For the foregoing reasons, the Pennsylvania Rule does
not apply to these facts.

III. <u>COMPARATIVE FAULT</u>

The plaintiffs are comparatively at fault for their
injuries.  The standard for determining causation under

---

finds the Pennsylvania Rule inapplicable here.  The Court does agree
with Phipps to the extent he argues that the Pennsylvania Rule is not
limited solely to cases involving collisions between vessels.  Yet, in
the cases found by the Court in which the Pennsylvania Rule applied
and in which collisions between opposing parties' vessels did not
occur, the vessel(s) at issue either struck a stationary object … or
land [allisions].  Extending the applicability of the Pennsylvania
Rule to the instant fact scenario would appear to create a presumption
of negligence upon a finding of any statutory violation <u>involving an</u>
<u>injury aboard a vessel</u> in any situation at sea whatever.  A century of
caselaw interpreting THE PENNSYLVANIA has not so extended its
impact").  (emphasis added)

the Jones Act is identical for comparative fault.
Causation under the Jones Act requires the plaintiff to
prove that the "vessel's negligence played any part, even
in the slightest, in producing the injuries for which the
plaintiff seeks damages." *Napier v. F/V DEESIE, INC., 454
F.3d 61, 67 (1st Cir. 2006)*.  Applying this standard, the
plaintiffs are comparatively at fault if their negligence
played any part, even in the slightest, in producing the
injuries they sustained. *Norfolk Southern Railway Co. v.
Sorrell*, 127 S.Ct. 799, 166 L.Ed.2d 638 (2007).

    A.   <u>JONES ACT NEGLIGENCE</u>

    The doctrine of comparative fault, to wit, that the
contributory negligence of a plaintiff does not bar
recovery, applies to the plaintiffs' Jones Act negligence
claims.  The Jones Act incorporates by reference the
Federal Employers Liability Act (45 U.S.C. §51 et seq.).[7]
The Federal Employers Liability Act (hereinafter referred
to as "FELA") contains is a comparative fault statute (45
U.S.C.A. §53).  The first part of Section 53, which is
entitled "Contributory negligence; diminution of damages,"

_____

[7] The Jones Act states: "A seaman injured in the course of his
employment or, if the seaman dies from the injury, the personal
representative of the seaman may elect to bring a civil action at law,
with the right of trial by jury, against the employer.  Laws of the
United States regulating recovery for personal injury to, or death of,
a railway employee shall apply to an action under this section.:  46
U.S.C.A. §30104; accord *Kernan v. American Dredging Co., 355 U.S. 426,
439, 78 S.Ct. 394, 401-07, 2 L.Ed.2d 382 (1958)*.

states:

> "In all actions on and after April 22, 1908 brought
> against any such common carrier by railroad under or
> by virtue of any of the provisions of this chapter to
> recover damages for personal injuries to an employee,
> or where such injuries have resulted in his death,
> the fact that the employee may have been guilty of
> contributory negligence shall not bar recovery, <u>but
> the damages shall be diminished by the jury in
> proportion to the amount of negligence attributable
> to such employee:</u>"  (emphasis added)

The doctrine of comparative fault applies to the

plaintiffs' Jones Act negligence claims by virtue of

Section 53.

The plaintiffs contend that the defendant violated a

safety statute and, as a consequence, they cannot be found

comparatively at fault pursuant to the second part Section

53. The second part of Section 53 states:

> "That no such employee who may be injured or killed
> shall be held to have been guilty of contributory
> negligence in any case where the violation by such
> common carrier of any statute enacted for the safety
> of employees contributed to the injury of death of
> such employee."

In *Pratico v. Portland Terminal Co., 783 F.2d 255 (1st Cir.

1985)*, the First Circuit concluded, in the context of a

FELA action, that the violation of an Occupational Safety

& Health Act (OSHA) regulation could be deemed negligence

per se under Section 53.[8]  The First Circuit has yet to

---

[8] After P*ratico v. Portland Terminal Co.* was decided, *the Third,
Fourth, and Ninth Circuits determined that a violation of an OSHA
regulation can never be equated with negligence per se.  Ries v.*

address whether a U.S. Coast Guard violation, in the context of the Jones Act, constitutes negligence per se under Section 53.[9]

Nevertheless, as a basis for its decision in *Pratico v. Portland Terminal Co.*, the First Circuit relied upon the legislative intent of Section 53, which indicates:

> "that Congress considered this elimination of contributory negligence to be simply a reflection of the common law doctrine of negligence per se: [t]he effect of the provision is to make a violation of such a statute negligence per se on the part of the employer." Id. at 268.

"Under traditional negligence per se analysis, proof of defendant's violation of a safety statute designed to protect the party who was injured against the type of injury which occurred, relieves a plaintiff from pleading the negligence elements of foreseeability, duty and breach." *Moody v. Boston & Maine Corp., 921 F.2d 1, 4 (1st Cir. 1990).*[10]   However, a plaintiff is not relieved from

---

*National R.R. Passenger Corp., 960 F.2d 1156, 1160-65 (3rd Cir. 1992); Albrecht v. Baltimore & Ohio R.R. Co., 808 F.2d 329, 332-33 (4th Cir. 1987); Robertson v. Burlington N. R.R. Co., 32 F.3d 408, 409-11 (9th Cir. 1994).* Based upon these cases, the First Circuit in *Elliott v. S.D. Warren Company*, 134 F.3d 1 (1st Cir. 1998) questioned the validity of *Pratico v. Portland Terminal Co.*

[9] The District Court of Massachusetts; however, addressed the issue in *Martin v. Allen, 2004 WL 964187*, and *Kelly v. Keystone Shipping Company, 281 F.Supp.2d 313 (2003).*

[10] The Fifth and Ninth Circuits have identified five (5) factors that a plaintiff must satisfy in order to establish negligence per se under the Jones Act for a safety statute violation.  The factors are as follows: (1) a violation of Coast Guard regulations, (2) the plaintiff's membership in the class of intended beneficiaries of the

establishing that his injuries were a result of the violation of the safety statute.  Id.

The plaintiffs are attempting to shift their burden of proof on causation under Section 53 onto to the defendant by applying the Pennsylvania Rule.[11]  The defendant has already established that the Pennsylvania Rule does not apply to these facts, but further submits that it cannot be applied for the purpose of interpreting the provisions of Section 53.  The Pennsylvania Rule is a principle established under the General Maritime Law. Section 53 does not incorporate the General Maritime Law and, as a result, <u>it must be construed in accordance with its legislative intent, statutory language, and subsequent FELA decisions</u>.

The Pennsylvania Rule and Section 53 cannot be read in conjunction without destroying their intent and purpose.  The intent of the Pennsylvania Rule is to shift the burden of proof onto the defendant for a statutory violation.  As confirmed by the First Circuit, the Pennsylvania Rule is not intended to "shield the claimant

---

regulations, (3) an injury of a type against which the regulations are designed to protect, (4) the unexcused nature of the regulatory violation, and (5) causation.  *Roy Crook & Sons, Inc. v. Allen, 778 F.2d 1037 (5th Cir. 1985); Fuszek v. Royal King Fisheries, Inc., 98 F.3d 514 (9th Cir. 1996).*

[11] In other words, the plaintiffs are asking this Court to combine Section 53 and the General Maritime Law.

from liability for contributory fault." *Continental Grain Co. v. Puerto Rico Maritime Shipping Authority, 972 F.2d 426, 436 (1st Cir. 1992)*.  The intent and purpose of Section 53 is the complete opposite.  Section 53 is intended to completely shield a plaintiff from liability for the violation of safety statute that contributes to his injuries.

Applying the Pennsylvania Rule to Section 53 will also contradict its legislative intent and First Circuit precedent interpreting that statute.  In *Moody v. Boston & Maine Corp., 921 F.2d 1 (1st Cir. 1990)*, the First Circuit confirmed that Section 53 does not shift the burden of proof on causation onto the defendant for a safety statute violation under the Federal Employers' Liability Act.  *Id. at 4.*  In reaching its decision, the First Circuit relied upon the legislative intent of Section 53, as well as other FELA cases interpreting that statute, including its decision in *Pratico v. Portland Terminal, Co., 783 F.2d 255 (1st Cir. 1985).*

The Pennsylvania Rule contradicts the legislative intent of Section 53 and First Circuit precedent interpreting that statute, because it shifts the burden of proof on causation onto the defendant for a statutory

violation.[12]  The Pennsylvania Rule and Section 53 cannot
be read in conjunction.  Section 53 must be construed in
accordance with its legislative intent, statutory
language, and subsequent FELA decisions.  To the extent
that the plaintiffs prove that the defendant violated a
safety statute, they still have the burden of proving
causation, to wit, that the violation contributed to the
injuries sustained, pursuant to First Circuit precedent.

    B.  UNSEAWORTHINESS

    The doctrine of comparative fault also applies to the
plaintiffs' independent claims for Unseaworthiness under
the General Maritime Law.  In the case of *United States v.*
*Reliable Transfer, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d*
*251 (1975)*, the U.S. Supreme Court changed the admiralty
rule of divided damages and adopted the doctrine of
comparative fault.[13]  Section 53 does not apply to the
plaintiffs' independent claims for Unseaworthiness under
the General Maritime Law.[14]  *Smith v. Tidewater, Inc., 918*

---

[12] Again, the defendant emphasizes that must be construed in accordance
with its legislative intent, statutory language, and subsequent FELA
decisions.

[13] *Id. at 441* (liability should "be allocated among the parties
proportionately to the comparative degree of their fault").

[14] "Unseaworthiness has been defined by the Supreme Court as a separate
cause of action and unique from a claim under the Jones Act." *Napier*
*v. F/V DEESIE, INC., 454 F.3d 61, 67 (1st Cir. 2006) citing Ferrara v.*
*A&V Fishing, Inc., 99 F3d 449, 452 (1st Cir. 1996) (quoting Usner v.*
*Luckenbach Overseas Corp., 400 U.S. 494, 498, 91 S.Ct. 514, 27 L.Ed.2d*
*562 (1971).  Unlike the Jones Act, the General Maritime Law does not*

*So.2d 1, 22, 2005 A.M.C. 972, 2004-0195 (La.App. 4th Cir.*
*March 2, 2005) adhered to on rehearing (August 17,*
*2005)*(Section 53 does not apply to causes of actions under
the General Maritime Law).

Accordingly, the defendant's alleged U.S. Coast Guard
violation does not preclude a finding that the plaintiffs
were comparatively at fault for their injuries under the
General Maritime Law.


IV.  <u>COLLATERAL SOURCE RULE</u>

Following the incident, Mr. LaLiberte collected
approximately $45,000.00 through the long-term disability
plan offered by the defendant.  Additionally,
approximately $1,700.00 of his medical bills was paid by
the defendant's medical plan.  Mr. Brooks did not collect
any long-term disability payments, but approximately
$3,000.00 of his medical bills were paid by the
defendant's medical plan.  The defendant's medical and
long-term disability plans are funded entirely by the
defendant and administered by a third-party.

The defendant is entitled to a $45,000.00 set-off
against any award for lost wages obtained by Mr.

---

incorporate FELA.

LaLiberte.[15]  The $45,000.00 collected by Mr. LaLiberte constitutes two-thirds of his salary between September 4, 2003 and August 23, 2006.  "The substantive aspect of the collateral source rule in Massachusetts provides that "compensation received from a third party unrelated to a tortfeasor-defendant (the collateral source) will not diminish an injured party's recovery from that tortfeasor." *England v. Reinauer Transportation Co., 194 F.3d 265, 273 (1st Cir. 1999).*  The Collateral Source Rule does not apply because the defendant was the source of the long-term disability payments received by Mr. LaLiberte.

The defendant has already paid Mr. LaLiberte two-thirds of his lost wages between September 4, 2003 and August 23, 2006.  If he receives an award for lost wages and the defendant is not entitled to a set-off, then he will receive a double recovery at the defendant's expense. To eliminate the plaintiff from receiving a windfall, and to eliminate the defendant from having to pay the same element of damage twice, justice mandates that any award for lost wages be reduced by the amount already paid by the defendant.

The plaintiff will likely contend that the defendant is not entitled to a set-off because the long-term

---

[15] See, 45 U.S.C. §55 entitled "Contract, rule, regulation, or device exempting from liability; set-off"

disability plan is a fringe benefit, which the defendant did not secure for legal liability purposes.  In support thereof, the plaintiff will cite to the several factors articulated by the Fifth Circuit in *Philips v. Western Company of North America, 953 F.2d 923 (5th Cir. 1992)*. These factors have not been adopted by the First Circuit and should not be given any significant weight by this Honorable Court.  In reaching its decision, the defendant urges the Court to adhere to the principles of equity.

Nonetheless, the defendant prevails under the factors articulated by the Fifth Circuit, which are (1) whether the employee makes any contribution to funding of the disability payment, (2) whether the benefit plan stems from a collective bargaining agreement, (3) whether the plan covers both work-related and nonwork-related injuries, (4) whether payments from the plan are contingent upon length of service of the employee, and (5) whether the plan contains any specific language contemplating a set-off of benefits received under the plan against a judgment received in a tort action.  *Id. at 932*.

The defendant's employees do not contribute to the funding of the plan, the plan covers both work and

nonwork-related injuries, and payments under the plan are not contingent upon an employee's length of service. All of these factors weigh in favor of the defendant. *Davis v. Odeco, Inc., 18 F.3d 1237, 1245 (5th Cir. 1994)*. The plan does stem from a collective bargaining agreement and does not have any specific language relating to a set-off; however, the plan does state that an employee has "to reimburse the Plan to the extent of benefits provided, immediately upon collection of damages by him, whether by action at law, settlement or otherwise."

Alternatively, the defendant is entitled to a $45,000.00 set-off against any award for Maintenance and Cure obtained by Mr. LaLiberte. Maintenance & Cure is a seaman's right under the General Maritime Law to receive food and lodging (Maintenance) and necessary incident-related medical services (Cure) if he becomes ill or injured while in the service of the vessel. A vessel owner's no-fault obligation to furnish Maintenance & Cure benefits is unrelated to any duty of care under tort law. Because of the unique nature of Maintenance and Cure, normal rules of damages, such as the Collateral Source Rule in tort, are not strictly applied. *Smith v. United States, 943 F.Suipp 159, 172 (D.Mass. 1996); Davis v. Odeco, Inc., 18 F.3d 1237, 1245-47 (5th Cir. 1994)*.

There is no question that Mr. LaLiberte, through the defendant's long-term disability plan, received payments sufficient to satisfy his food and lodging expenses during his alleged recovery period.  It should be noted that Mr. LaLiberte, in addition to receiving long-term disability, also received $35.00 per day from the defendant pursuant to its Maintenance & Cure obligation between August 5, 2003 and May 31, 2005 ($23,310.00).


                              By its attorneys,

                              **CLINTON & MUZYKA, P.C.**


                              "/s/ Thomas J. Muzyka
                              Thomas J. Muzyka
                              BBO No: 365540
                              Kenneth M. Chiarello
                              BBO No: 639274
                              One Washington Mall
                              Suite 1400
                              Boston, MA  02108
                              (617) 723-9165