UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                )
MARK LALIBERTE,                 )
     Plaintiff                  )
                                )
V.                              )    Civil Action
                                )    No. 05-11224-MLW
WOODS HOLE, MARTHA'S            )
VINEYARD AND NANTUCKET          )
STEAMSHIP AUTHORITY,            )
     Defendant                  )
_____)
                                )
BARRY BROOKS,                   )
     Plaintiff                  )
                                )    Civil Action
V.                              )    No. 05-11861-MLW
                                )
WOODS HOLE, MARTHA'S            )
VINEYARD AND NANTUCKET          )
STEAMSHIP AUTHORITY,            )
     Defendant                  )
_____)

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION TO STRIKE CERTAIN EXPERT OPINIONS OF JOSEPH MOKRY

Now comes the defendant, Woods Hole, Martha's

Vineyard & Nantucket Steamship Authority, in the above-

entitled action, by and through its undersigned counsel,

Clinton & Muzyka, P.C., and respectfully files it

Opposition to Plaintiff's Motion To Strike Certain

Opinions of Joseph Mokry.

As grounds in support, the defendant submits the

following for the Court's consideration.

**BACKGROUND**

On August 4, 2003, the plaintiffs were involved in an incident while serving onboard the M/V ISLANDER, which was owned and operated by the defendant.  As a result of the incident, the plaintiffs brought these actions alleging Jones Act negligence, Unseaworthiness, Maintenance & Cure, and failure to provide Maintenance & Cure.  The defendant has stipulated to a finding in favor of the plaintiffs on their Jones Act negligence and Unseaworthiness claims (Counts I & II).

**FACTS**

This matter involves a scheduled man overboard drill on the M/V ISLANDER on August 4, 2003.  The United States Coast Guard was in attendance and observing the drill. The incident was video-taped and an analysis of the video-taped drill, as well as a review of the extensive deposition testimony, was made by Defendant's expert Joseph Mokry of Ocean Rescue Systems.  Specifically, Plaintiff has moved to strike the opinion of Joseph Mokry that Plaintiff Brooks failed to exercise personal responsibility by securing his personal flotation device and that this failure was causally related to his injury. Plaintiff maintains that Mr. Mokry is not qualified to render this opinion and/or that the opinion is unreliable,

essentially for the same reason.  Defendant asserts that Joseph Mokry is a recognized expert in man overboard procedures and is eminently qualified to render the opinion.  Further, Defendant asserts that the opinion is reliable, as that standard is mandated by *Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)*.

**ARGUMENT**

### A.    Qualifications

Plaintiff initially contests the qualifications of Joseph Mokry to render an opinion about the causal relationship between Plaintiff Barry Brooks failure to properly secure his personal flotation device and his injury.  Plaintiff does not appear to contest that the failure of Plaintiff Brooks to secure his personal flotation device constituted a failure of personal responsibility.  Plaintiff's objection is to his conclusion that there was a causal connection between this failure and his injury.  Plaintiff maintains that such opinion is a scientific opinion that requires training in physics and hydrodynamics.  Defendant asserts that the Plaintiff's argument is incorrect and that, as a matter of law, Joseph Mokry is qualified to render the opinion on causation.

Rule 702 of the Federal Rules of Evidence and the decisions of the United States Supreme Court and the lower courts recognize five bases for qualifying an expert: "knowledge, skill, experience, training or education." See Rule 702 of the Federal Rules of Evidence. It is clear from the wording of the Rule that a background in just one of these areas is sufficient. *U.S. v. Paiva, 892 F.2nd 148, 160 (1st Cir. 1989)("A witness may qualify as an expert on any one of the five listed grounds").* For example, a witness with an academic background in a given area but no practical experience is still qualified as an expert. *DaSilva v. American Brands, 845 F.2nd 356, 361 (1st Cir. 1988)("We therefore are not persuaded to abandon the general rule that a court should consider all relevant qualifications when ruling on the admissibility of expert testimony").* The converse is also true: an expert with experience but no formal education is qualified to render expert opinions. *Thomas v. Newton International Enterprises, 42 F.3rd 1266 (9th Cir. 1994)(In civil action arising out of personal injuries suffered by a longshoreman working on a ship, trial court did not err in permitting witness with 29 years experience as a longshoreman to testify concerning proper safety procedures); U.S. v. Hoffman, 832 F.2nd 1299 (1st Cir.*

1987).  See also, *Lauria v. National Railroad Passenger Corp., 145 F.3rd 593 (3rd Cir. 1998).*  Assuming the witness' background, experience or training qualify the witness as an expert, the witness is competent to testify as an expert and there is no additional requirement.  *U.S. v. Baskin, 886 F.2nd 383 (D.C. Cir. 1989).*

While Rule 702 does not define the meaning of the terms used to describe the bases for expert qualification, the courts have given them common sense interpretations.  "Education" may be formal or informal self-study. *American Technology Resources v. U.S., 893 F.2nd 651 (3rd Cir. 1990); Dawsey v. Olin Corp., 782 F.2nd 1254 (5th Cir. 1986).*  "Training" usually means on the instruction or work related classes.  *U.S. v. Marler, 614 F.2nd 47 (5th Cir. 1980).*  "Skill" is a specialized aptitude developed as a result of significant involvement with a specific subject. *Western Industries, Inc. v. Newcor Canada, Ltd, 739 F.2nd 1198 (7th Cir. 1984).*  Lastly, "experience" qualifies a witness so long as it is obtained in a practical context. *U.S. v. Johnson, 575 F.2nd 1347 (5th Cir. 1978).*

The degree of "knowledge, skill, experience, training, or education" sufficient to qualify as an expert witness is only that degree necessary to insure that the

witness' testimony "assist" the trier of fact.  *Robinson v. GEICO General Ins. Co., 447 F.3rd 1096 (8th Cir. 2006).*

In the case at bar, there can be no question that Joseph Mokry is qualified to render the opinions stated. He resides in South Portland, Maine and was born in 1948. He attended Loyola University of Chicago, receiving a Bachelor of Science Degree in Biology and a Master's degree in Biology from Memorial University in Newfoundland, Canada.  In addition, he worked on a German freighter and on Greek ferryboats.

In 1984, he left the academic field and opened a scuba diving shop in St. John's, Newfoundland. There, he provided diving services for fishing boats as well as training services for divers from the Canadian Coast Guard.  He did that until 1989, when he returned to the United States.

Prior to returning to the United States, he began to develop a greater interest in the marine rescue field. While still in Canada, he had received formal education in the marine rescue field.  He obtained a Captain's license and received formal navigation training.  He obtained a position as an Adjunct Professor at Memorial University in Newfoundland in the Fisheries College as an Assistant

Instructor and then as an Instructor in maritime rescue operations.

When he returned to the United States, he was enlisted to train Coast Guard personnel in water safety operations, both from shore and from vessels.  He also worked in the sea urchin industry in Maine as a commercial diver.   In 1990 he forms Ocean Rescue Systems to teach personnel on rescue operations.  He has been working full time in this business for over 15 years.

He has also published various articles in peer-reviewed journals on general rescue operations, rescue swimmer operations, and rescue boats operations. Additional qualifications are stated in his Curriculum Vitae, which is attached hereto as Exhibit "1".  Defendant also attaches hereto as Exhibit "2" pertinent portions of his deposition which details his qualifications as stated above.

Captain Mokry was retained by the Defendant and provided copies of the Coast Guard report, photographs, and witness statements, including the statement of Steven Bonoli.  After reviewing the pertinent information provided, he prepared a report, a complete copy of which is attached hereto as Exhibit "3".  The report included an

extensive analysis of the information and the photographs in rendering his opinions.

Thus, Defendant asserts that Joseph Mokry is qualified to render the opinion on causation based up all five factors.  He has received the requisite "knowledge" to render the opinion.  He has extensive training in marine rescue techniques, he has taught that subject in Canada and the United States.  He has been professionally employed in that field for over 15 years.

He has the requisite "skill" to render the opinion. He has been specially engaged and significantly involved in the marine rescue field for in excess of 15 years as a teacher and consultant.

He also has the requisite "experience" to render the opinion.  Not only has he received extensive training and instruction on marine rescue techniques, but he has authored articles in peer-review magazines and taught the subject as an Instructor and consultant.  Even more importantly, Plaintiff contends that Captain Mokry cannot render an opinion about causation because he is not qualified to render an opinion on a topic that requires training in physics and hydrodynamics.  Defendant disputes that such training is required, but Plaintiff totally ignores that fact that Captain Mokry is experienced in

being dragged behind a boat because it has happened to him on many occasions.  See page 165 of the deposition of Joseph Mokry.  Thus, the opinion is supported by experience, training, knowledge and skill, all of which constitute an independent basis for admission of the opinion by Captain Mokry that the failure to properly secure personal flotation device was causally related to his injury.

### B.  Reliability

Plaintiff additionally asserts that the opinion of Joseph Mokry on causation should be excluded because it is unreliable, essentially for the same reason as stated above.

Expert testimony is admissible only if the expert is qualified and the testimony is sufficiently reliable. *Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999)(applying the standards as expressed in Daubert to non-scientific expert testimony).*  The trial court, as the "gatekeeper", must make a preliminary assessment of whether the reasoning or methodology can be properly applied to the facts in issue.  *Cabrera v. Cordis Corp., 134 F.3rd 1418 (9th Cir. 1998).*  Defendant asserts that the opinion of Joseph Mokry is reliable and any points that Plaintiff asserts are properly raised in cross-examination, but are

not a basis to exclude an otherwise qualified and reliable opinion. *Galentine v. Estate of Stekervetz, 273 F. Supp. 2nd 538 (D.Del. 2003)*. Plaintiff has offered no expert testimony to support his testimony that the method and experience of Joseph Mokry are not reliable or that the testimony is contrary to any scientific or physical principle. Joseph Mokry based his opinion on his knowledge, training and experience in the maritime rescue field. Defendant asserts that he is qualified to render the opinion and the opinion is amply based on the evidence adduced in the investigation. Any defects that Plaintiff believes are present in Joseph Mokry's opinion are for his counsel to bring out on cross-examination and for the fact finder to assess. But the opinion itself is sufficiently reliable to assist the trier of fact.

**WHEREFORE**, the defendant, Woods Hole, Martha's Vineyard & Nantucket Steamship Authority, prays that this Honorable Court deny Plaintiff's Motion to Strike Certain Expert Opinions of Joseph Mokry.

By its attorneys,

**CLINTON & MUZYKA, P.C.**


**"/s/ Thomas J. Muzyka__**
**Thomas J. Muzyka**
**BBO NO. 365540**
**Kenneth M. Chiarello**
**BBO NO. 639274**
One Washington Mall
Suite 1400
Boston, MA 02108
(617) 723-9165

Dated:  August 27, 2007

# EXHIBIT "1"

# RESCUE-RELATED QUALIFICATIONS AND EXPERIENCE
## JOSEPH EDWARD MOKRY

Owner/operator of Ocean Rescue Systems

Education and Certifications

    M.Sc. Biology (Master's of Science)- Memorial University of Newfoundland

    Instructor- National Association of Underwater Instructors (NAUI) and Technical Diving International (TDI)

    Instructor Trainer and Course Director- NAUI and TDI/SDI

    Board of Directors/Advisors - Emergency Response Diving International

    Emergency Medical Technician- National Registry

    First Aid, CPR, AED and $O_2$ Instructor- American Red Cross

    Licensed Able-Bodied Seaman (Merchant Marine, Germany)

    Captain's license (100 ton)- US Coast Guard

    US Coast Guard certified instructor- Fast Rescue Boats and Personal Survival

Practical Experience

    Have provided water rescue training to Public Safety personnel from several hundred departments from Puerto Rico to Canada (thousands trained).

    Developed programs and delivered boat-rescue and operations training to more than 1200 persons in the past five years.

    Developed and delivered surf/heavy weather small boat operations training program for the US Coast Guard Station San Juan, Puerto Rico.

    Instruct USCG-approved Fast Rescue Boat operations programs, one of only a handful of such courses approved worldwide.

    Developed program and train US Coast Guard Cutter Rescue Swimmers at the request of USCG Groups and Stations, all East Coast locations, (sole provider)

    Developed Rescue Swimmer training program for Canadian Coast Guard, Search and Rescue Branch.

    Train US Coast Guard Helicopter Rescue Swimmers in swiftwater rescue.

    Instructional Staff, Fast Rescue Craft program, Fisheries and Marine Institute of Memorial University, St.John's, Newfoundland. (formerly)

    Instructional Staff, Helicopter Ditching at Sea and Evacuation, Fisheries and Marine Institute of Memorial University, St.John's, Newfoundland. (formerly)

    Conduct annual Blue Water SAR training for USAF Pararescue units (sole provider)

    Maritime Security Boat Tactics - Instructor

Distinctions

    Captain, Cape Elizabeth Water Extrication Team (WETeam),Cape Elizabeth Fire Dept, perhaps the most decorated water emergency group in New England.

    Received US Coast Guard's Meritorious Public Service award for development of USCG Cutter Rescue Swimmer training program, and for organizing and directing special unit security boat patrols for high value assets, October, 2005. Presented by Admiral Pekoske, Commander, District 1.

    Received the US Coast Guard's Public Service Commendation for Lifesaving at Sea for boat-based surf rescue of helicopter pilot ditched at sea, 1995. Presented by Admiral Linnon, US Coast Guard District One Commander.

Case 1:05-cv-11224-MLW    Document 44-2    Filed 08/27/2007    Page 2 of 2

# RESCUE-RELATED QUALIFICATIONS AND EXPERIENCE
## JOSEPH EDWARD MOKRY

USCG Public Service Commendation 2003 for continuing involvement with ocean rescue operations and program development.

Medal of Bravery (Canada's 2nd highest award) for rescue actions during high surf accident operations. Presented by Governor-General of Canada, 1993.

Outstanding Service Award, for the development of water rescue and safety programs, National Association of Underwater Instructors, 1996.

Numerous other Special Recognition and Public Commendations awards for training programs and involvement in actual rescue operations.

Visiting Professor, Massachusetts Maritime Academy, Buzzards Bay, MA.

Instructor of special operations topics at Maine Maritime Academy, Castine, ME.

Author of many published articles on search and rescue-related topics.

Author of major new text book, Rescue Diving Manual- A Guide to Rescue Techniques, Stress, Injury, and Accident Management. Published by Technical Diving International/Scuba Diving International, 2001.

Author of 30 scientific papers (biological research) published in peer reviewed journals.

Featured on The Learning Channel for cold-water rescue and in-water resuscitation techniques, and boat rescue techniques, 2000.

Clients have included
> US Coast Guard Cutter Rescue Swimmers
> US Coast Guard Helicopter Rescue Swimmers
> US Coast Guard coxswains (BMs 1-3)
> US Air Force Pararescue units around the country
> US Marine Corps Small Boat Combat instructors
> Mid-Atlantic Narcotics Training Agency (marine interdiction training)
> Hundreds of Fire, Police, Sheriff's and Lifeguard services and departments throughout the country.
> Numerous Harbormasters groups and Marine Patrol units
> Logan Airport emergency response crews
> Bath Iron Works emergency response unit (annual)
> Martha's Vineyard, Nantucket, Woods Hole Ferry Service, rescue boat operators, Woods Hole, MA
> National Aeronautics and Atmospheric Administration (NOAA) - National Fisheries Service, Woods Hole, MA
> Woods Hole Oceanographic Institution, Woods Hole, MA

EXHIBIT "2"

Page 1

COPY

Volume: I
Pages: 1-298
Exhibits: 1-26

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

MARK LaLiberte,
                    Plaintiff
          vs.                        Docket No.
WOODS HOLE, MARTHA'S VINEYARD        CA 05-11224-MLW
AND NANTUCKET STEAMSHIP
AUTHORITY,
                    Defendant
          *   *   *   *   *   *   *
BARRY BROOKS,
                    Plaintiff
          vs.                        Docket No.
WOODS HOLE, MARTHA'S VINEYARD        CA 05-11224-MLW
AND NANTUCKET STEAMSHIP
AUTHORITY,
                    Defendant


               DEPOSITION of JOSEPH E. MOKRY, a
     witness called by and on behalf of the Plaintiffs,
     taken pursuant to the Federal Rules of Civil
     Procedure, before Heidi B. Stutz, Certified
     Shorthand Reporter No. 146599S and Notary Public in
     and for the Commonwealth of Massachusetts, at the
     offices of Latti & Anderson, LLP, 30-31 Union Wharf,
     Boston, Massachusetts, on Tuesday, June 19, 2007,
     commencing at 10:13 a.m.

                 Hennessey & Lange Court Reporting
                        50 Congress Street
                     Boston, Massachusetts 02109
            617-523-1874 ••• 800-645-6807 ••• Fax 617-523-7343

1   small stuff, I may copy them now.  I'm obviously not

2   going to copy depositions.  Why don't we figure that

3   out when we get to the end?

4                   MR. MUZYKA:  I just don't want to

5   have the same problem we had with Gibbons several

6   years ago.

7                   MR. ANDERSON:  Oh, I don't think

8   we'll have that problem.  That was a unique

9   situation.

10                  MR. MUZYKA:  That was a first.

11                  MR. ANDERSON:  Okay.

12  Whereupon:

13                  JOSEPH E. MOKRY,

14  having been satisfactorily identified and duly sworn

15  by the Notary Public, was examined and testified as

16  follows:

17                  DIRECT EXAMINATION

18       BY MR. ANDERSON:

19       Q.   Sir, can you please state your full name

20  and address?

21       A.   Full name is Joseph Edward Mokry,

22  M-O-K-R-Y.  Live at 457 Cottage Road, South

23  Portland, it's two words, Maine.

24       Q.   Can you briefly describe your academic

1 | background?

2 |     A.   I have a master's degree in biology, I

3 | have a bachelor's degree in honors, also in biology,

4 | and I have an ordinary four-year academic degree,

5 | also in biology, chemistry, and high school

6 | education, grade school education.

7 |     Q.   What did you do, have you done for work --

8 | did you get your education continuously or did you

9 | finish up college, go back, so forth?

10 |     A.   I did go back.  I went back to do my

11 | master's degree.  In between time I'd been working

12 | as a research biologist and realized I needed more

13 | qualifications and had the opportunity to do so, and

14 | so did a master's degree.

15 |     Q.   Okay.  So where did you graduate from

16 | college?

17 |     A.   I went to Loyola University of Chicago.

18 |     Q.   Okay.

19 |     A.   I'm sorry.

20 |     Q.   Go ahead.

21 |     A.   And my master's degree is from Memorial

22 | University of Newfoundland in Canada.  I was there

23 | working in a research lab, so I was able to take

24 | advantage of the proximity to do the master's.

1    Q.   What were you doing for work after you got

2    out of college?  Just briefly.  I'm going to move

3    quickly here.  If I need more detail, I'll follow

4    up.

5         A.   I did some emergency work for the

6    International Red Cross on the border between Greece

7    and Turkey during a cholera outbreak, I worked on a

8    German freighter for about a year as a deck hand,

9    and I worked in Africa, in Rhodesia, now Zimbabwe,

10   for a little over two years.

11        Q.   What were you doing there?

12        A.   Doing malaria research.

13        Q.   Okay.

14        A.   And following that, returned to North

15   America, was solicited to come work at a new

16   research lab that was opening up in St. John's,

17   Newfoundland, where Memorial University is,

18   technically hired by the university, but through an

19   applied science lab and continued my work on

20   tropical diseases there.

21        Q.   And that brings you up to close to age 30?

22        A.   Ages.  Let me get some calendar dates.

23   Probably somewhere -- I'm sorry, where specifically

24   are you looking for me to draw a line for time?

1    Q.   I'm just trying to get your both academic

2    and occupational background.  The stuff that was 20,

3    30 years is less significant, so --

4         A.   So it takes me, in the academic realm in

5    terms of research biology and so on, takes me up

6    until about 1984.

7         Q.   And you were how old at that time?

8         A.   Born in '48.  So do the math here.

9         Q.   Thirty-six?

10        A.   Thirty-six, I guess.

11        Q.   And during that first 36 years of your

12   life your experience on vessels, unrelated to

13   biology, was for that German freighter?

14        A.   German freighter.  I also worked on Greek

15   ferry boats for about eight months.

16        Q.   Okay.

17        A.   In Greece.

18        Q.   And so up until age 36 most of your work

19   was either humanitarian type work related to health

20   issues or marine biology, is that correct?

21        A.   That's accurate.

22        Q.   Okay.  So around 36 you, what did you do

23   after age 36?

24        A.   I decided I'd had enough of academic life

 1 | and opened a scuba diving shop with a partner in St.

 2 | John's, Newfoundland, and became reattached to the

 3 | marine environment on the working end inasmuch as we

 4 | provided both diving services for dragger boats and

 5 | trawlers and so on, would often go to sea with them

 6 | to work on gear, to dive gear, for example, for

 7 | them, tangled and fouled nets and so on, as well as

 8 | training divers, including divers from the Canadian

 9 | Coast Guard. Did that for five years.

10 |    Q.   Okay.  Where did you grow up?

11 |    A.   Chicago.

12 |    Q.   Okay.  Then what did you do?

13 |    A.   Returned to the United States at that

14 | time.  Concurrent with the diving I began developing

15 | a greater and greater interest in maritime rescue,

16 | marine rescue.  Naturally, working on the waterfront

17 | you're present in all kinds of circumstances where

18 | accidents happen and I had some casual involvement

19 | in rescues and it piqued my interest, especially

20 | realizing that very few people had the skills to

21 | deal with the emergencies.  I thought that it was

22 | something that -- it just piqued my interest.  And

23 | so I was asked to return to the United States, in

24 | Maine, to run some of the training programs that

 1   we'd already developed for the Canadian Coast Guard.

 2        Q.    During that five years as a diver did you

 3   get any education in terms of rescue training?

 4        A.    Yes, yes.

 5        Q.    Formal education.  Why don't you describe

 6   all the education you had, formal or informal?

 7        A.    Okay.  I did my initial captain's

 8   licensure at that time and navigation training,

 9   rescue training as well during that time.  I became

10   an assistant instructor and then instructor at the

11   Fisheries College, which is now a very large

12   concern.  Fast rescue craft operations, for example,

13   helicopter ditching operations for training offshore

14   oil rig crews.  At that time the oil industry was --

15        Q.    Where was this education received?

16        A.    This was all at what was called at that

17   time the Northeast Fisheries Training Center which

18   is an adjunct to Memorial University.  It's one of

19   only three in Canada and probably ten in North

20   America that's recognized for its training.  So I

21   had a greater and greater direct input both in

22   training and training other people in maritime

23   rescue operations, STCW-related type, if you're

24   familiar with that.

1        Q.    Okay.   So at some point you come back to

2   the States?

3        A.    That's correct.

4        Q.    And what did you do for work when you got

5   back to the States?

6        A.    When I came here I was originally

7   solicited to come to Maine to do some of the same

8   type of rescue, shore-base, but water rescue

9   training that we originally developed, I'd

10  originally developed for the Canadian Coast Guard.

11       Q.    Was this fresh water?

12       A.    No, no.  It's what we call rescue swimmer

13  training.  It's public safety or Coast Guard

14  personnel who are trained to deploy either from

15  shore or from vessels, not life guarding, but actual

16  rescue swimmers wearing all kinds of equipment as

17  required, working in all kinds of conditions to

18  reach stranded persons, and so on, to bring them

19  back.

20       Q.    Who were you working for?

21       A.    When I returned to the US I was still

22  working for myself at that time, although the client

23  was the Cape Elizabeth Fire Department in Cape

24  Elizabeth, Maine.

1    Q.   Okay.  And how long did you continue doing

2  this?

3    A.   At that time I was already calling the

4  company Ocean Rescue Systems.  To complete the

5  answer, what I did when I came back, the course work

6  was minimal at that time.  It was in 1990,

7  thereabouts.  And the majority of my income was

8  earned through sea urchin diving.  The urchin

9  industry, you may know, became a huge industry in

10  Maine, second largest fishery in the state.

11    Q.   Until it all went away.

12    A.   Until we took them all.

13    Q.   And that was primarily a dive fishery?

14    A.   That's correct.  And that was on-the-water

15  work.  And in fact, afforded me more opportunities

16  to get involved with rescue operations because

17  almost every day a boat was sinking or a diver was

18  in distress.  And I continue doing that now.  This

19  is full-time.

20    Q.   So you've got this company called --

21  what's it called?

22    A.   Ocean Rescue Systems.

23    Q.   Okay.  And Ocean Rescue Systems gets hired

24  by some entity, could be a fire and rescue

 1  department, could be state police, it could be sort

 2  of anyone?

 3      A.  Correct.

 4      Q.  And you would teach personnel on rescue

 5  operations, both rescue swimmers, rescue boats,

 6  things of that nature?

 7      A.  Correct.

 8      Q.  And that's basically, is that your primary

 9  source of income now?

10      A.  That's correct.

11      Q.  Okay.  And you've been doing that for how

12  many years?

13      A.  Full-time, 15 years.

14      Q.  Okay.  And who are your -- have you also

15  done litigation consulting with attorneys?

16      A.  On one previous occasion.

17      Q.  Okay.  What case was that?

18      A.  It's a case of a woman kayaker who

19  drowned.  A fresh water circumstance venturing too

20  close to the outfall of a small dam on a river, and

21  she drowned.

22      Q.  And on which side were you hired?  Who was

23  getting sued and on which side were you on?

24      A.  The construction company, Cianbro was

1    first --

2         A.   I've never seen such a side-by-side

3    comparison.

4         Q.   Okay.  So that the -- and you've never

5    learned something in school or training about the

6    difference between being dragged backwards behind a

7    boat with a PDF half on versus PDF fully secured,

8    correct?

9         A.   That's correct.

10        Q.   So it's not education?

11             MR. MUZYKA:  Objection.

12        Q.   It's not training?

13             MR. MUZYKA:  Objection.

14        Q.   It's not calculations, and it's not

15   experimentation, correct?

16        A.   It's not?

17        Q.   It's not any of those four?

18             MR. MUZYKA:  Objection.

19        A.   The last one was?

20        Q.   Calculation.

21        A.   Experimentation did you say?

22        Q.   Yeah, experimentation.

23        A.   Yes, that's correct.

24        Q.   Okay.  So therefore the only thing that's

1   left is experience, correct, in terms of the basis

2   of your opinion, correct?

3        A.   I wasn't sure that you didn't mention that

4   one of the first thing or two.

5        Q.   Well, excuse me, let me be more clear

6   about that.  Experience in other areas, should I

7   say, scuba diving, for example.  Is that correct?

8        A.   I'm sorry, you need to ask me that as a

9   complete question.

10       Q.   We've already gone through what your

11  opinion is not based on.

12       A.   Right.

13       Q.   I won't go into that again.  Now you said

14  yes, it is, because I have some experience in

15  somewhat similar environments and you mentioned

16  being pulled behind a boat while scuba diving,

17  correct?

18       A.   Yes.

19       Q.   Any other similar type experiences which

20  you base your opinion in connection with the Brooks

21  and LaLiberte case?

22       A.   Not directly comparable, no, sir.

23       Q.   Okay.  So the only thing that's directly

24  comparable is being pulled behind a dive boat with

1   scuba diving gear on, correct?

2       A.   Yes, that's correct.  But that's not the

3   sole basis for my reasoning.

4       Q.   What other basis do you have for your

5   reasoning other than --

6       A.   My experience with -- I'm sorry, I didn't

7   mean to interrupt you.  Long experience with dealing

8   with training people in personal flotation devices

9   of all kinds, all descriptions.

10      Q.   That tells you you need to, how to put

11  them on, you need to put them on properly.  That's

12  not what I'm asking about now.  I'm asking you

13  about --

14               MR. MUZYKA:  Objection.  I don't

15  think that's what it's limited to.  That's what

16  you're trying to limit it to.

17      Q.   Well, how did training people help you

18  determine what effect of having it half zippered or

19  not zippered at all would have on an individual

20  dragged behind a boat by his leg, how does training,

21  teaching other people how to do this stuff help you

22  determine the effect of it when you're dragged

23  behind a boat?

24      A.   As I said, I have nothing directly

1  comparable in terms of being dragged behind a boat.
2  But I base my conclusions in part on a long time
3  experience training people with PDFs.  I can
4  elaborate.

5       Q.   Go ahead.

6       A.   There are many different types of PDFs out
7  there.  For commercial mariners, for example, they
8  use one style.  For inshore boaters, they use
9  another style.  For inland, there's another style
10 that's available.  One of the things that's of
11 interest is that Type 1 PDFs, which are supposed to
12 be worn by offshore mariners, are supposed to, are
13 certified, in fact, to float the wearer upright,
14 face out of the water when they're unconscious.

15             UL does the testing for the Coast
16 Guard.  The test is that you're to do three breast
17 strokes and then put your face in the water and the
18 PDF is certified to say it's guaranteed to float you
19 face up.  The fact of the matter is in only about 60
20 to 70 percent of cases does that actually happen.
21 People drown all the time with Type 1 PDFs on,
22 properly secured.  And part of the reasoning is
23 people are different.  People's bodies react a
24 little bit differently.  It's an imperfect

Page 176

1    technology.  There's a lot of reasons why PDFs work

2    in some instances and don't work in other instances.

3                    My point in talking about this is

4    that we put a lot of people and a lot of different

5    PDFs in a lot of different circumstances in white

6    water, in moving water, in fresh water, in

7    saltwater, in pool water, and we see a lot of

8    different examples of how PDFs react with bodies.

9    And I'm drawing on many years of experience on the

10   effect of PDFs on the body and how the body now as a

11   system reacts, while granting that you have no

12   direct, comparable evidence of what any of those

13   PDFs would do on the body if it's being dragged

14   backwards.

15        Q.   Okay.  Those examples you used, white

16   water, white water, fresh water, saltwater, the

17   whole, pools, etc., in each of those situations the

18   relative movement of the body versus the water is

19   the same, that is to say, the person is not being

20   dragged through the water, including white water?

21        A.   In none of the circumstances I described

22   is the person being dragged through the water.

23        Q.   Even in white water --

24        A.   The comparable effects can be achieved



# M/V Islander
# Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
# 08/04/03

**Analysis and Report by**
**Joseph Mokry**
**Ocean Rescue Systems**
**www.oceanrescue.com**
**JMokry@oceanrescue.com**
**(207) 799-3299**

# Table of Contents

Disposition of Crew and Recreated Narrative of Events    Page 1

Analysis of Passenger Photos of Accident Scene    Page 5

Procedure for Launch of Rescue Boats from Mother Vessels  Page 25

Commentary and Conclusions    Page 30

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
### 08/04/03

### Disposition of Crew and Recreated Narrative of Events

This analysis and report of the circumstances surrounding the capsizing of the davit-deployed rescue boat from the MV Islander is not intended to be a general discussion of the shipboard events that led to this accident. Much of the factual basis and succession of events that contributed to this near fatality have been collated and recorded by Shore Captain Greg Gifford and the official US Coast Guard report.

The intent here is to describe the actions of both shipboard and rescue boat crew in respect to the launch of the rescue boat, in particular, those actions which may have materially contributed to the mishap. This report includes an analysis of a series of photographs taken by a passenger in a good position to observe the launch procedure. Extracts of crew and passenger testimony that illuminate events on deck or in the rescue boat will be noted as appropriate, though there will be no large scale recounting here of their observations. From this a step by step review of the launch sequence will be recreated.

The evaluation of the recreated launch procedure will be contrasted with generally accepted safe practices as a means of determining lessons learned. Several errors were noted in the launching process and these will be highlighted in the Commentary and Conclusions with a view to improve safety and effectiveness of the procedure.

Disposition of crew immediately preceding and during accident:

    Captain David Dandridge- Forward and Aft Wheelhouses
    Pilot/Mate Ellen Ferguson- Forward and Aft Wheelhouses and Boat Deck
    Chief Engineer Frank Kinkaid- Engine Room, Emergency generator room
        and Boat Deck
    Boatswain (Bos'n) William Munson- Rescue Boat winch station
    AB John Mendes- Rescue Boat winch station
    AB Steve Bonoli- Helmsman, Forward and Aft Wheelhouses
    AB Barry Brooks- Coxswain, Rescue Boat
    AB Mark Laliberte- Crew, Rescue Boat
    OS Michael Kuhn- Bow sea painter
    OS Thomas Henrique- Aft sea painter
    Roy Smith- Lookout, aft Wheelhouse
    John Lobo- Galley and aft bridge lookout, then davit
    Bernard Holzer- Purser, Lookout, aft wheelhouse
    Unknown- Oiler, Engine room and Emergency Generator room.

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

Recreated narrative:

The anticipated man overboard (MOB) drill was begun at 0943 when US Coast Guard Inspector CWO4 Glenn Barton dropped the rescue dummy, Oscar, overboard. Lookouts assumed their assigned positions and actual rescue operators staffed their stations. At the freight deck doors, awaiting the lowering of the rescue boat to their level, were AB Barry Brooks and AB Mark Laliberte. Brooks was to be the rescue boat coxswain (driver) and Laliberte was assigned as crew. Above them on the boat deck Bos'n William Munson directed activities for attaching and winching the rescue boat over the side. The winch was operated under his direction by AB John Mendes. OS Michael Kuhn held and secured the bow painter while OS Thomas Henrique tended the stern painter.

In the event there was misunderstanding on the boat deck due to confusing communications from the Captain and lack of specific direction for this particular drill. In addition the Captain unexpectedly reversed the MV Islander after what is generally agreed was about a two minute stop in the water. As in past drills the crew took this stop as the indication to lower the rescue boat, though they had not been ordered to do so on this occasion.

Lifting the rescue boat from the cradle required Bos'n Munson to attach the winch cable hook to the three lifting straps that are permanently fixed to interior lifting points in the boat. The electric winch is then activated to raise the boat from the cradle. The Bos'n will also ensure that the fuel line is connected to the outboard, that there is fuel in the tank and that any other required gear is on board. Prior to swinging the boat out over the water, the Bos'n will pass the painters to the fore and aft line tenders who will then take up stations well fore and aft of the boat. The express and specific purpose of the painters is to stabilize the rescue boat as it is being lowered and as it sits in the water prior to departure. Tension is maintained on both lines to keep the rescue boat from swinging or spinning during lowering and raising, as well as when it rides alongside the mother vessel. Proper attention to the use of the painters is critical to safe launch and recovery.

Though the davit is electrically powered to the drum for raising the rescue boat, it is cranked by hand to extend the arm out over the water. AB Mendes was responsible for cranking the davit out to the proper position. Note on the ship's plan (port side) that the line of fall from the davit line does not pass directly past the freight deck doors where Brooks and Laliberte were waiting. It was necessary for AB Mendes to crank the davit past the natural fall line (perpendicular to the hull) until it was pointing aft.

The davit on the MV Islander is gravity operated during lowering, that is, when the break is released, the weight of the boat and crew will cause cable to unwind from the drum and the boat is lowered. Cable will not unwind unless there is tension (weight) on the line. Braking is controlled from the davit station, not from the rescue boat.

The rescue boat was lowered to the water, below the level of the freight doors. A rope ladder (Jacob's ladder) was dropped into the boat from the freight deck and AB Mendes and then AB Laliberte climbed down the ladder and into the boat. AB Brooks

OCEAN RESCUE SYSTEMS

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection 08/04/03

immediately set about attempting to start the outboard engine. AB Laliberte immediately disconnected the bow painter from the extension that is permanently fixed to the towing eye of the rescue boat, and secured the free end of the extension to the forward deck cleat. He then clipped the bow painter to the lowering cable. AB Laliberte did not disconnect the cable hook from the lifting straps, but, instead, stood by while Brooks continued to try to start the engine. At this point the bow of the rescue boat was no longer connected to the MV Islander. Photographs strongly suggest that, while Laliberte's PFD (personal flotation device) is well secured and adjusted, Brooks' PFD is gaping open and possibly not zipped or adjusted at all.

The rescue boat is being held by the cable and aft sea painter at this time. In order to disconnect the cable hook from the lifting straps, there must be slack in the cable. This is a deliberate safety feature built in to the system so that the boat cannot be released during the descent or ascent, resulting in a possible serious accident. Photographic evidence clearly shows that there was more than adequate slack in the cable for the release mechanism to operate.

At about this time or moments later, the MV Islander began to make sternway as the Captain has moved to the aft wheelhouse with the presumed intention of bringing his ship back to closer proximity to the MOB. Failure to communicate this intention to the crew catches them by surprise with the stern of the rescue boat now facing the direction of apparent water flow. This results in significant water being shipped over the transom of the rescue boat. Pressure building against the transom also causes the rescue boat to be forced away from the hull of the MV Islander. The rescue boat swings in this manner (that is, stern away from the Islander) because of the location of the aft painter's connection on the starboard side of the transom of the rescue boat.

The stern pressure on the rescue boat begins to drag it toward the bow end of the Islander until all slack is taken out of the cable. At the same time the aft sea painter is helping to keep the rescue boat with its stern toward the apparent water flow with the result that water continues to pour over the transom. The deck crew recognizes this danger early on and undertakes to inform the Captain that he must stop all motion in the Islander, but to no avail. At some stage the aft sea painter is released, either due to irresistible tension on the line, or deliberately to allow the stern to swing away from the apparent water flow. Immediately, the rescue boat, now held only by the cable, turns side to with its bow pointed in toward the hull, and pendulums forward to the extent of the cable. All slack is now out of the cable, and with significant tension (weight) of the boat bucketing water as it broaches, there is no way the hook can be released to free the boat.

Meanwhile, sternway is being maintained. This is seen by a bight of the released aft sea painter being carried under and forward of the rescue boat. At the limit of its pendulum the 'upstream' side (that is, starboard side) will dip, catch the current and roll over completely. AB Laliberte jumps or is thrown clear, but AB Brooks is trapped for a short time under the overturned boat. Both men are now being left behind by the Islander as it continues aft. The men are heard to reassure each other that they are both all right

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
## 08/04/03

and caution each other about the close proximity of the moving ship. They begin to swim away together.

Very quickly after this, the bight of aft sea painter catches or wraps around Brooks' left foot. Since the Islander still has some sternway on, he is dragged backwards through the water and eventually pulled under despite his PFD. More correctly, his motion through the water produces a bow wave that submerges him. His unsecured PFD is seen very nearly removed from his body. Laliberte is now some distance away from Brooks as they were literally traveling in opposite directions. Laliberte is clear enough from the Islander to be picked up by a small tour boat responding to the emergency.

Laliberte is transported by the tour boat to near Brooks who is now at the surface. All motion from the Islander appears to have stopped and Brooks is again on the surface, though face down and nearly without his PFD. Laliberte reaches Brooks and attempts to swim him to the tour boat, but is hampered by the wrapped sea painter. A passenger leaps from the Islander and assists in unwrapping Brooks and helps swim him to the tour boat. All three persons are removed and CPR begun on the lifeless Brooks, who will eventually recover.

# Analysis and Report on Capsizing of Rescue Boat
# during Quarterly US Coast Guard Inspection
# 08/04/03

### Analysis of Passenger Photographs of Accident Scene

Analysis of photo sequence taken and provided by passenger, Randy Hackbart, r.hackbart@shaw.ca , taken from Boat deck, M/V Islander, 08/04/2003.

DSC_1821.jpg

AB Barry Brooks and AB Mark Laliberte are aboard the rescue boat, a 13' Rigid Inflatable Boat (RIB) Avon Searider model SR4M, equipped with 15 HP Johnson outboard engine. Jacob's ladder for crew boarding from the freight deck doors is still in boat. Rescue boat (RB) is being pulled astern by stern sea painter as M/V islander makes sternway. Placement of stern painter on starboard side transom (near side to Islander) causes RB stern to feather away from Islander. AB Brooks is apparently trying to start outboard. AB Laliberte has disconnected bow sea painter from extension lanyard that is fastened to the towing ring under the bow, and has secured the lanyard to inside forward deck cleat. Laliberte is in the process of clipping the bow painter to the lowering winch cable at a point above the hook arrangement. The 'gripping' or steadying line is visible and slightly forward of RB, indicating a small drift to the stern of the Islander with tension on the stern painter keeping it in this position. This drift aft is also suggested by the fact that the Jacob's ladder appears to be directly amidships in the Avon, while the ship's plans show the boarding doors at least 10' aft of the davit. Small amount of slack in hoisting/lowering cable is evident in the sag of the lifting bridle lines.

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8121



OCEAN RESCUE SYSTEMS 2007

M/V Islander

## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection 08/04/03

DSC_8121 enlarged to show detail. Note various lines and Laliberte clipping bow painter to cable. Winch cable is barely visible behind gripping line.



OCEAN RESCUE SYSTEMS 2007

**M/V Islander**
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8122.jpg

Avon continues to be dragged aft by Islander, still making sternway. Avon appears to have moved forward on Islander as tension increases on stern painter, possibly due to rope stretch or sliding through line tender's hands, and has brought bow against the Islander's hull. Laliberte is shouting toward deck crew. Brooks continues to attempt to start outboard. His personal flotation device appears slack and possibly not zipped closed. Water is being visibly shipped over the transom. Forward sea painter (bow line) is very obviously clipped to winch cable. Greater slack in the lifting lines is evident, confirming forward movement of Avon as it returns to directly under davit. On davit arm fixed length griping line is evident as is limiter switch which prevents Avon from being 'over wound' when hoisted. Crewmember, presumably Pilot/Mate Ellen Ferguson is talking on handheld radio. US Coast Guard inspectors observe from boat deck.

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8122



OCEAN RESCUE SYSTEMS 2007

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8122 enlarged to show detail. Note that Avon has moved toward bow, tensioning stern line, and is under gripping line (=davit). Lifting bridle lines slack.



10

## M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8123.jpg

Avon is broached and capsized. Laliberte is cast into the water; Brooks is not visible in photo. The stern painter has been released some moments before, a bight of which is swept under Avon. The bitter end is visible in the water aft of the Avon. The boat is, therefore, suspended only from the cable wire at this time.



11

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8123 enlarged to show detail. Note loose stern painter in water.



M/V Islander

## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8124

Laliberte and Brooks are in the water, both looking in the direction of the bow end of the Islander. Avon is not in field of view and has presumably passed aft of them as the Islander continues to make way astern. Laliberte's personal flotation device (PFD) seems sung and well secured to his body. Brooks' PFD has floated up to his head and is gaping open in front. It is not clear that it is secured to him in any way. Despite the fact that he has certainly been dunked as the boat overturned and possibly held briefly under the boat, he is conscious and appears in good condition. His eyeglasses are still on, though displaced slightly.

DSC-8124



OCEAN RESCUE SYSTEMS 2007

## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8124 enlarged to show detail. Note loose PFD and eyeglasses still in place.



**M/V Islander**

## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
### 08/04/03

DSC_8125

    Avon, freed of restraints of painters, stays in its sideways position and pulls heavily behind Islander, suspended only by cable. No apparent slackening of sternway of Islander. Avon has pulled more cable because of its drag and is now almost directly below forward sea painter position on deck. Forward sea painter clip has ridden up cable and has wrapped around cable several times. Clearly visible is aft sea painter (stern line) streaming after Avon.

DSC_8125



**M/V Islander**

## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8125 enlarged to show detail.



16

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
### during Quarterly US Coast Guard Inspection
### 08/04/03

DSC_8126

     Fully inverted, Avon feathers away slightly from Islander. Cable and bow line are visible. Loose stern painter is seen streaming to right. Water is seen streaming from forward ballast pocket breather holes, near towing ring.



DSC_8126 enlarged to show detail.



1.

17

**M/V Islander**

## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8127

Boat approaches Islander which is still making some sternway. Laliberte is on board this boat and is preparing to jump into the water to assist Brooks. Brooks is completely submerged and clearly visible under water, depth about 1 foot or less. While not free entirely of his body, the PFD has ridden up over his head and is not providing any significant flotation.



# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8127 enlarged to show detail.



DSC_8128
    Laliberte swims to Brooks who has popped up to the surface, face down in the water.



19                          OCEAN RESCUE SYSTEMS 2007

**M/V Islander**

## Analysis and Report on Capsizing of Rescue Boat
### during Quarterly US Coast Guard Inspection
### 08/04/03

DSC_8129

Laliberte swims to Brooks who has remained on the surface, face down in the water. Much of the sternway motion of the Islander appears to have diminished by this time.



## M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8130

    Small boat has Laliberte and Brooks alongside its port bow. Laliberte is clearly struggling to keep Brooks afloat. Boat crew appears uncertain of how to help.



**M/V Islander**
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection 08/04/03

DSC_8131
Laliberte is holding onto bow line dropped by the small boat and is being towed away from Islander. Clearly visible is stern painter looped around Brooks' left foot. It is possible that there is still tension in the painter, indicating that the Islander still has some motion.



DSC_8131 enlarged to show detail. Note line around Brooks' left foot.



OCEAN RESCUE SYSTEMS 2007

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
### 08/04/03

DSC_8132
View of overturned Avon. Islander is dead in the water.



23

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

DSC_8133

Vineyard Haven Patrol Boat is alongside Islander; actions uncertain. Bow painter and cable barely visible along hull. Stern painter visible and still streamed away toward bow of Islander.



OCEAN RESCUE SYSTEMS 2007

## M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

### Procedure for Launch of Rescue Boats from Mother Vessels

While there is some variation in launch procedures due to differences in hull types, rigging systems and rescue boat style, there is otherwise great uniformity in equipment and launching steps. Vessels with twin davit systems, for example, will usually load the crew aboard prior to lowering the rescue boat, while single davits may not be rated for the extra load beyond that of the boat itself. In some instances the height of the boat deck where the rescue boat is stored may be so high that it is unsafe to lower crew, especially in rough or windy conditions. In yet other cases there may be no lower ports from which to embark rescue boat crew, so crew will always have to board the boat before lowering. Despite all this, there is a generally recognized procedure that applies in the great majority of cases.



The rescue boat is secured in its cradle by tie-downs that may pin directly to the deck as above or wrap over the boat and secure to the cradle itself.



Lifting straps are permanently attached to three points in the rescue boat and join together in a lifting ring. Most often the straps are anchored through the stem post (which backs into the towing eye) and at the port and starboard sides of the transom. This 3-point suspension system gives good stability to the boat as it is being lowered and raised.

25                                          OCEAN RESCUE SYSTEMS

### M/V Islander
### Analysis and Report on Capsizing of Rescue Boat
### during Quarterly US Coast Guard Inspection
### 08/04/03

In cases where the crew embarks before the boat is lowered, it is typical that they will control the rate of descent themselves. This gives them greater flexibility and choice in how they want to set down on the water. The cable hook connects the winch to the lifting ring and, as a safety feature, cannot be opened while the boat is suspended. In practical terms if the boat is set down too gently on the water, there will still be residual tension in the cable connection and the hook will not open. In this case the crew member will manually haul slack down from the drum by using his own weight. This can be difficult, especially in rough conditions and very often requires both persons to use their combined weight to pull down slack. For this reason the coxswain (who usually controls the brake wire) will usually let the boat 'free fall' in the last 3 feet of descent. This builds momentum in the cable and drum and lets additional cable pay out. The resulting slack allows the hook to be opened and detached.



With crew onboard the rescue boat is prepared to be swung over the side and lowered. Note that bow and stern painters are deployed and manned while the onboard crew checks that all straps are properly straight and attached and that the brake wire is operable.



Enlargement showing davit arm, limiter switch which stops winch to prevent rewinding the rescue boat too high, the crew controlled brake wire and lifting straps and lifting ring. By pulling on the brake wire the coxswain can speed or slow the descent to the water.

OCEAN RESCUE SYSTEMS

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
### 08/04/03

As the rescue boat is lowered, tension is maintained on the painters to prevent the boat from swinging or spinning.



Once in the water, the coxswain moves to start the engine while crewman begins to disconnect the hook. Normally, the hook is not released until the engine is started, but only to save having to reconnect it should the engine fail to start. Otherwise, there is no reason not to disconnect it as a first order of business for the crewman.

Once the engine is started and the hook is released, the coxswain will unclip the stern painter and connect it to the hook or cable. This is done so that the deck crew can pull the hook away from the boat without winching the hook back up to the drum. If they did this, there would be no weight on the hook to lower it to the boat when they return and need to be recovered. It is almost always preferable to connect the stern painter to the hook or one of the solid links rather than the cable itself. Depending on the angle the aft painter makes with the cable, pulling back on the painter to raise the hook may merely result in the clip sliding up the cable without actually raising the hook.

With the aft painter and cable both disconnected from the rescue boat, the boat will stream comfortably back on its bow painter.



With only the bow painter attached to the rescue boat the forward motion of the mother vessel will keep the rescue boat neatly alongside. Note that the bow painter is abandoned in the water after it is unclipped. The float on the end expedites recovery of the painter when the rescue boat returns.

OCEAN RESCUE SYSTEMS

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03



When coming alongside to recover the rescue boat, the crewman uses a boat hook to bring the bow painter on board.



The crewman unties the extension lanyard form the forward deck cleat and connects ot to the bow painter.



After the bow painter is attached to the extension, the crewman casts the bow painter back overboard. The coxswain then eases back on the throttle and allows the rescue boat to come back and be towed by the mother vessel.

OCEAN RESCUE SYSTEMS

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
### during Quarterly US Coast Guard Inspection
### 08/04/03



When the rescue boat cuts power and falls back on the bow painter, it should be exactly beneath the davit arm and hook. The hook is then lowered, usually swung slowly out by paying out slack in the stern painter and reconnected to the lifting straps.

When the cable is securely attached, the coxswain removes the aft painter from the hook and clips it onto the transom. With both painters and hook in place, the coxswain will shut down the outboard and signal to the deck crew to winch the rescue boat back to the deck.

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
## 08/04/03

### Commentary and Conclusions

I do not intend to dwell on what has been called the 'causal factor' of this accident, namely, the Captain's failure to provide a detailed response plan to the MOB exercise, and to communicate his own intentions in this response. Clearly, his actions and inactions set this near tragedy in motion, but in all complex incidents there is a chain of events, the absence of any one of which could have averted this accident. There is a snowball effect visible here that is permitted to become an avalanche.

The review of statements from the various crew and passengers, an analysis of the photographs and the recreated narrative raise several interesting and significant questions. One concerns the outboard engine itself. Why didn't it start? With the prospect of the MOB drill looming, crew members had started the engine at least twice prior to the start of the drill. It was reported to be working fine. Its failure to start looms large considering that, if the engine had started promptly, the rescue boat might well have been clear before the Islander made serious sternway.

Small, hand cranked outboards have a reputation for occasionally being difficult to start. Small Johnson outboards are in fact notorious for this. Still it had reportedly started without difficulty only the night before the incident in question. There are at least two possible answers. One is that AB Barry Brooks lacked sufficient experience with this particular engine and made critical errors in the starting procedure. Examples of typical errors are failure to fully seat the 'dead man's switch', attempting to start while in gear, applying too much throttle, crimping the fuel line and so on. The evidence presented, however, does not speak to any of this.

Another possibility is raised by Bos'n William Munson's statement that, anticipating the MOB drill by moments, he checked the rescue boat, connected the fuel line, pumped up pressure in the in-line fuel bulb and then cranked the engine to "put gas in the carburetor". The drill began almost immediately after this, and the rescue boat was lowered to the water. AB Brooks reportedly pulled out the choke and then cranked the engine. This sequence of events could easily have flooded the small outboard and made starting very problematic. Flooding, incidentally, occurs when too much gasoline is introduced into the cylinders with too little air to allow combustion to take place. This is commonplace in small outboards, especially if they're been cranked several times. Under the circumstances pulling out the choke, which limits air supply and provides a richer gas mixture and is otherwise normal procedure, may likely have caused the engine to flood.

Several points around the handling of the sea painters and winch cable also play as factors that affected the chain of events. For example, Mark Laliberte immediately disconnected the bow sea painter after he entered the rescue boat. This is a clear error. The bow painter is last line to be dropped. The reason for this is that the rescue boat can trail back on the painter if the mother vessel still has some way on which is much more normal than the vessel being stopped completely for the launch. It's easy to imagine the consequences of early dropping of the bow painter if the vessel still has some way on.

## M/V Islander
## Analysis and Report on Capsizing of Rescue Boat
## during Quarterly US Coast Guard Inspection
## 08/04/03

They would, in fact, have almost exactly the same as what happened in the present case, that is, the rescue boat would have pulled away from the Islander, turned broadside and swamped. BOTH painters must stay attached until the engine is running, but clearing the bow painter first will lead to trouble.

Next, Laliberte clipped the bow painter to the cable. Normal procedure is to cast the bow painter overboard after it is disconnected, so that it can be readily retrieved when the rescue boat returns. Typically the end of the bow painter has a float to make it easier to pick up by the forward crew member. Once retrieved, the rescue boat can hang back on the painter and should be directly under the davit arm. It is also an error to clip either painter directly around the cable. Normal procedure is to clip the painter (stern painter) to a link in the hook assembly.

The reason for this requires a little mental exercise. It's clear that the metal clip is capable of sliding up and down the cable as it's not actually fixed in position. Hauling back on the painter to remove the heavy steel hook assembly from too close proximity to the crew (think head injury) has often resulted in the clip merely sliding up the cable and not really moving the hook at all. The hook may still be just above the crew, but now is likely swinging back and forth. I have witnessed this in the past. Even more hazardous, when the hook is being swung down, clipped off on the stern painter; the clip may again easily slip up the cable, resulting in an unexpected drop of the hook. Since hook height is about or just below head height, serious injury may occur.

In any case with the bow painter now clipped off on the cable, Laliberte stands by the hook, ready to release it when the engine starts. There are actually two schools of thought on Laliberte's position. One is that the hook should be released immediately when the boat is set in the water as the boat will ride much better on the painters alone. Also if there is any swell or rough water, the boat's up and down motion brings the heavy hook in dangerous proximity to the boat crew. The other line of thinking is that the hook should be released when the engine starts. At this point the coxswain will release the stern painter and pass it to the crewman who will attach it to the hook. Deck crew will then haul the hook away. Whichever method is policy, however, the crewman will station himself at the hook to control its motion.

What is clear is that Laliberte was unable to release the hook when he finally chose to do so. It is puzzling why he could not do this. In photo DSC_8122 where he is apparently calling for more slack (several statements affirm this) so that he can release the hook (remember this cannot be done under tension) there is clearly slack in the lifting lines (see enlargement). This is not an insignificant matter, since this is the next to last causal step that results in the rescue boat swamping and flooding.

The final enabling link in this chain occurs when the stern painter is dropped from the Islander. There is no clear evidence as to how this occurred. We do know that OS Thomas Henrique was tending the stern painter and that at some stage Pilot/Mate Ferguson had him assist at the davit station and then accompany her below decks. Was

OCEAN RESCUE SYSTEMS

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
### 08/04/03

the aft painter deliberately abandoned to allow the rescue boat to swing away from a stern first attitude, and thus not ship so much water? Was it the irresistible force of the rescue boat loaded with water and dragging heavily away that pulled the line from his hands? Did the force pull the line away despite securing it through a cleat? None of this clear or even mentioned in the crew statements, but its release sealed the fate of the rescue boat.

At this point the rescue boat was fully abeam the apparent water flow and could pendulum on the cable. It would only have taken seconds for the starboard rail to dip and dump the crew. In this case it rolled completely. Note that if the cable had been disconnected earlier, the rescue boat would now have floated free of the Islander, engine running or not.

Brooks and Laliberte are now both in the water. Both are apparently conscious and alert, though no doubt shaken. Brooks' improperly secured PFD will now become an issue as it is barely keeping his face out of the water. He is in fact sinking through it. They are heard conversing and begin to swim away. The final irony of the mismanaged lines is that the stern painter snags Brooks as it trails behind the departing rescue boat. Pulled along by the line and with his unsecured PFD nearly stripped off his body, Brooks is submerged long enough to drown. Only Laliberte's near heroic intervention saves his life. It is speculative to say that if the PFD had been properly worn that Brooks would not have drowned, but it is certain that, not fastened, he would have no chance of survival on his own.

The matter of Brooks' PFD cannot be overstated. About to undertake an activity that maximizes the opportunity to end up in the water, that is, onboard crew during the launching and recovering of the rescue boat, Brooks fails to properly adjust and secure his life jacket. A landsman may be forgiven not donning a life jacket during an at sea exercise, but this is truly surprising in a professional mariner. Even more remarkable is that no one pointed this out to him as he boarded the rescue boat. Munson and even the US Coast Guard inspectors must have noticed this, but there is no record of their trying to remind him to zip his jacket. Laliberte was with Brooks every second of the exercise, and, though he securely donned his own jacket, he neglected to check his buddy for the same basic safety procedure.

Ultimately, however, we are all responsible for our own safety. We may remind each other of the safe way of doing things, but it's up to us to act to protect ourselves. Brooks himself may have held the final link in the chain that resulted in his submergence and drowning.

# M/V Islander
## Analysis and Report on Capsizing of Rescue Boat during Quarterly US Coast Guard Inspection
### 08/04/03

### Conclusions

1. Nothing in my review of all available evidence contradicts the initial finding that Captain David Dandridge's failure to plan a coordinated response to the MOB exercise caused the misunderstanding that resulted in the premature launching of the rescue boat.

2. Captain Dandridge's unexpected action in backing the Islander down to the overboard Oscar when the rescue boat was in the water and secured to the Islander by the painters and cable put the rescue boat and crew in extreme peril.

3. AB Mark Laliberte erred by disconnecting the bow painter before any other actions had been performed, though this did not materially contribute to this specific incident.

4. AB Mark Laliberte erred by clipping the bow painter to the cable, though this did not materially contribute to this specific incident.

5. AB Mark Laliberte was not able to release the hook from the lifting straps when he tried to do so. The reason for this is not clear (it does NOT appear to be a result of too much tension in the line as he suggested in his statement), but this failure ultimately contributed materially to the capsizing of the boat.

6. OS Henrique either cast off or lost control of the stern painter. This materially contributed to the capsizing of the rescue boat by allowing it to be dragged on its beam by the cable.

7. AB Barry Brooks failed to exercise personal responsibility by ensuring that his life jacket was full adjusted and properly secured to his body. It is likely that this materially contributed to his drowning.

8. AB Mark Laliberte failed in his duty to his shipmate by inspecting and ensuring that his personal protective gear was properly worn.

