UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| BARRY BROOKS,<br>    Plaintiff<br><br>V.<br><br>WOODS HOLE, MARTHA'S<br>VINEYARD AND NANTUCKET<br>STEAMSHIP AUTHORITY,<br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action<br><br>No. 05-11861-MLW |
| MARK LALIBERTE,<br>    Plaintiff<br><br>V.<br><br>WOODS HOLE, MARTHA'S<br>VINEYARD AND NANTUCKET<br>STEAMSHIP AUTHORITY,<br>    Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action<br><br>No. 05-11224-MLW |

PLAINTIFF BARRY BROOK'S OPPOSITION
TO
DEFENDANT'S MOTION IN LIMINE TO PRECLUDE BARRY BROOKS FROM
OFFERING ANY EVIDENCE CONCERNING THE NATURE AND EXTENT OF HIS POST
TRAUMATIC STRESS DISORDER SYMPTOMS

Now comes the Plaintiff in the above captioned matter and opposes Defendant's Motion in Limine to Preclude Barry Brooks from Offering any evidence Concerning the Nature and Extent of his Post-Traumatic Stress Disorder Symptoms.

As grounds thereof Plaintiff states that by submitting Dr. Schouten's 2005 letter in support of its motion rather than Dr. Schouten's April 2007 report, the Defendant is attempting

to mislead the Court into believing that Dr. Schouten was not able to review Plaintiff's prior mental health records but rather relied exclusively upon his interview with the Plaintiff. This is simply not the case. <u>See</u>, <u>Report of Dr. Schouten</u>, pp. 8-9 (Attached as Ex. "A"). Contrary to the assertions of the in Defendant's Motion, the Defendant's Medical Expert, Dr. Schouten <u>was</u> able to review many if not all[1] of the Plaintiff's prior psychiatric records dating as far back as the 1980's. (<u>See</u>, <u>Report of Schouten</u>, pp. 8-9, (Attached as Ex. "A"), <u>Depo of Schouten</u>, pp 202-203 (Attached as Ex. "B"), Further it should be noted that the Plaintiff provided the Defendant with medical authorizations <u>See</u>, <u>Authorization</u> (Attached as Ex. "C") and identified all prior medical providers in answers to interrogatories from which the Defendant had an equal opportunity to track down the prior medical records. Plaintiff claims damages for Post Traumatic Stress Disorder a condition for which he has never been treated and therefore any prior medical records do not "relate" to the injuries "allegedly sustained as a result of the incident" and therefore do not fall within the scope of documents requested by the Defendant in Request #2. <u>Defendant's Request No. 2</u>. Finally, it should be noted that the Plaintiff served a timely and proper objection to the Defendant's Request #2, and the Defendant never moved to compel its production.

In his April 30, 2007 report, Defendant's expert set forth Mr. Brook's prior psychiatric history in detail. <u>Report of Dr. Schouten</u>, pp. 8-9 (Attached as Ex. "A"). Presumably based upon the medical records acquired through Plaintiff's Automatic Disclosure as well as Medical Authorizations previously provided to Defendant, Defendant's expert Dr. Schouten was able to

---

[1] Dr. Schouten testified in his deposition that medical records are only required to be kept for seven years. While some of the records dating back to the 1980 have been acquired it is not known if the remaining records still exist and if so their current location. <u>Depo. of Dr. Schouten</u>, P. 202 (Ex. "A")

get a full picture of Plaintiff's prior mental health history. <u>Id.</u> At no point in either his deposition or his expert report did Dr. Schouten indicate that he need additional records to form his opinion. In fact Dr. Schouten testified that the Plaintiff's Post Traumatic Stress was not related to his pre-existing depression/anxiety. <u>Depo of Dr. Schouten</u>, P. 204 (Ex. B).

     WHEREFORE , the Plaintiff respectfully requests that <u>Defendant's Motion in Limine to Preclude Barry Brooks from Offering any evidence Concerning the Nature and Extent of his Post-Traumatic Stress Disorder Symptoms</u> be Denied.

                                Respectfully submitted,
                                Barry Brooks, Plaintiff,
                                Mark LaLiberte, Plaintiff
                                By their attorneys,

                                _____
                                David F. Anderson
                                BBO #560994
                                Carolyn M. Latti
                                BBO #567394
                                Latti & Anderson LLP
                                30-31 Union Wharf
                                Boston, MA 02109
                                (617) 523-1000

Dated:

CERTIFICATE OF SERVICE

      I hereby certify that on this date, I electronically filed the within document with the Clerk of the Court using the CM/ECF system which will send notification of such filing(s) to all counsel of record.

                                                    /s/ David F. Anderson
                                                    David F. Anderson, Esq.
                                                    Latti & Anderson LLP
                                                    30-31 Union Wharf
                                                    Boston, MA 02109
                                                    617-523-1000

Dated:



**MASSACHUSETTS GENERAL HOSPITAL**

Law & Psychiatry Service
55 Fruit Street
WACC 805
Boston, Massachusetts 02114-2621
Tel: 617.726.5195, Fax: 617.724.2808
Email: rschouten@partners.org

Ronald Schouten, M.D., J.D.
*Director, Law & Psychiatry Service*
*Associate Professor of Psychiatry*
*Harvard Medical School*



PLAINTIFF'S EXHIBIT "A"

EXHIBIT 36
8/1/07

## PSYCHIATRIC EVALUATION OF BARRY E. BROOKS

**DATE OF INTERVIEW: December 14, 2005**
**DATE OF REPORT: April 30, 2007**

**Identifying Information:**

Mr. Brooks is a 59-year-old man who has brought a legal action against his employer, the Wood's Hole, Martha's Vineyard & Nantucket Steamship Authority (Steamship Authority). He was 58 years old at the time of this evaluation.

**Circumstances of the Evaluation:**

In his action against the Steamship Authority, Mr. Brooks alleges that on August 4, 2003, he suffered physical and emotional injuries as the result of negligence on the part of the Steamship Authority and the captain of the ship M/V Islander. These injuries allegedly occurred when Mr. Brooks was dragged under water during the course of a man overboard drill. Mr. Brooks was referred to this office for an independent evaluation of the nature and extent of any emotional or psychological injuries he may have suffered and his degree of current impairment.

**Sources of Information:**

Mr. Brooks was interviewed in my office at Massachusetts General Hospital on December 14, 2005 for a period of 2.75 hours. In addition to the information obtained in that interview, I reviewed the following information in conducting this evaluation.

- Medical records form The Psychiatric Center of Cape Cod, 10/01/03-10/22/04, 12/01/05-01/26/07
- Medical records from Cape Cod Hospital, 10/04/95
- Report of an echocardiogram performed at Falmouth Hospital, 09/13/04
- Medical records from The Psychiatric Collaborative, 08/22/03-10/14/04; 03/04/06-07/05/06
- Medical records from Abraham Dietz, M.D., 09/27/89-01/26/01
- Medical records from Falmouth Hospital, 05/08/02-02/19/04
- Medical records from Martha's Vineyard Hospital, 08/04/03

A Teaching Affiliate of Harvard Medical School

PARTNERS. HealthCare System Member

- Prescription records from Working/Rx
- Medical records from Rhode Island Hospital, 08/04/03-08/07/03
- Medical records from Mir F. Shuttari, M.D., 08/09/03-07/08/04
- Transcript of the deposition of Barry Brooks, taken April 4, 2007
- Plaintiff's Answers to Defendant's Interrogatories
- Plaintiff's Expert Witness Designation

**Consent to the Evaluation:**

At the start of the interview, I informed Mr. Brooks that I am a psychiatrist and had been asked by the attorneys for the Steamship Authority to evaluate him in connection with his claims for emotional damages. I emphasized that our meeting was not for the purpose of treatment but rather was a part of the litigation process, and that the information he provided would not be held in confidence. Specifically, I noted that I would be discussing my findings with the attorneys for the Steamship Authority, might be writing a report, and might be asked to testify about it in a deposition or a trial. In light of the limitations on confidentiality, I informed Mr. Brooks that he could decline to answer any or all questions I posed to him and that his refusal could be addressed by the attorneys and the judge. Mr. Brooks expressed a full understanding of the limitations on confidentiality and agreed to proceed. He was open and cooperative throughout the interview.

**Relevant History:**

Mr. Brooks was born in Boston, Massachusetts and grew up in Hanover, Massachusetts, although the family lived in Upstate New York when he was between the ages of 10 and 12. They moved to Cape Cod when he was 13, living first in Marstons Mills and then settling in Falmouth. Mr. Brooks' father was a shipbuilder and pipe fitter who commuted to the Quincy shipyard. His mother was a homemaker. Mr. Brooks has two sisters, both younger than him. He describes their childhood as being "pretty good," with lots of outdoor activities.

According to Mr. Brooks, he was a fair student in the Falmouth school system. At his deposition, however, he testified that he was left back one year in seventh grade for poor performance. He denies attentional or disciplinary problems in school. Upon graduation, he attended Southeastern Massachusetts Technological Institute for one or two semesters, leaving the school because there was too much commuting. He then took time off from school and worked as a laboratory technician for 3-M Corporation for two years. He then worked a variety of jobs as a biologist collecting samples and operating a boat for two different firms. He worked for one of the companies, Marine Research, Inc. for a total of 14 years. During this period, he took time off to obtain a bachelors' degree in biology through several institutions, eventually graduating from the University of Massachusetts-Dartmouth. At various times, he also ran a tour boat on Bass River, was a crew member on a fishing boat, and was a narrator on a whale watch boat. Mr. Brooks was unable to give me the exact sequence of these jobs. In 1982, he and three partners had their own whale watch business. The partnership did not go well in many ways, including

2

financially, and Mr. Brooks found himself living in his truck for a while. He feels that he adapted well to that situation.

In 1995, Mr. Brooks obtained a part time job working for the Steamship Authority. He was still doing whale watches at the time, but switched over after finding that he liked the new work. He began as an ordinary seaman, working part time. The following spring, he began working full time and started as a messman. He stayed in that role for one summer, and then returned to being an ordinary seaman the next season, where he remained for several years. He then became an able bodied seaman after taking what he described as an extensive examination on helmsmanship, firefighting, knot tying, and other skills. Mr. Brooks described that he expected he would become a boatswain or pilot after being an able bodied seaman.

Mr. Brooks provided a detailed description of the man overboard drill on the day in question. He stated that after the Coast Guard threw the dummy and the life ring overboard, he and Mark Laliberte opened the freight deck door and put on their life vests. They waited for the order to go after the dummy, and when it came, they climbed down the Jacob's ladder and got in the lifeboat. Mr. Brooks recalled that the engine did not start on the first pull, and "then everything happened." He states that the boat he was in capsized after "the captain decided to move the vessel to the other side."

When asked to describe what happened next, Mr. Brooks stated that it was "all vague." He recalled bubbles, seeing the propeller of the boat, and hearing the thump of the engine. He states that he had a line around his ankle and he was pulled under the water. He recalls that he thought about his wife, who was supposed to pick him up after work so they could celebrate their anniversary, and wondered what she would think when he was not there. He was sure that he would die, and wondered when the captain would stop the boat so that he could have a chance of surviving. Mr. Brooks states that everything went blank after that. His next memory is of waking up in Rhode Island Hospital (which Mr. Brooks refers to as Providence Hospital) "with tubes in [his] lungs" and with a priest over him, giving him the last rites. At his deposition, Mr. Brooks testified that he first woke up at Martha's Vineyard Hospital.

At his deposition, Mr. Brooks testified that a wave hit the stern of the boat he was in, capsizing it, and that he found himself in the water with his head above water. He testified that after an indeterminate period, he "went underwater like a bobber, just poof." Mr. Brooks attributed this to being pulled under by a cable or line around his ankle.

According to Mr. Brooks, he experienced dissociation at the time of the accident, i.e. felt he was looking down on himself and watching and hearing the events from above. He states that he was having a seizure at Rhode Island Hospital and could hear the doctor say "we'll lose him" and throw his stethoscope on the floor. At his deposition, he testified that this happened at Martha's Vineyard Hospital, and that it occurred after he felt a rumble in his chest and could not get oxygen. He also testified that when he later awoke at Rhode Island Hospital, he had "tubes down into [his] lungs" and his hands and legs were tied. He was extubated and discharged home after 4 days.

3

Mr. Brooks has heard from others that a passenger jumped in to save him and that he had no color and no pulse when brought out of the water. He has also heard that Mark Laliberte jumped on his chest and gave him CPR. He describes a variety of physical injuries and symptoms immediately after the incident: headaches, chafing of his ankle from the line, and slight numbness of his foot below the ankle. He states that he still occasionally awakens with left foot numbness. He also heard from others that his life vest had slipped up, was about off, and that the only reason he was found was that a small patch of orange was showing.

According to Mr. Brooks, the crew of the yacht Vigilant, which was carrying 13-16 adolescents who were learning seamanship, pulled him from the water. He notes that the Steamship Authority paid for psychiatric treatment for the adolescents, but "someone in management" said that he (Mr. Brooks) should not get his treatment covered. He points out that the Vigilant sent him "a beautiful present and a picture of the kids." He kept the picture up for awhile and now has it in a file. Looking at it made him feel good "that somebody cared." He notes that only Mark Laliberte from his crew attempted to save him, and he wonders why no one else cared and why they went into recovery rather than rescue mode. He is able to put a positive spin on the event, noting that there were people who cared enough to save his life.

When asked about psychological symptoms following the incident, Mr. Brooks reports having nightmares of the accident that occur on average twice a week, although he does not have them every week. At his deposition, he testified that the nightmares are about "being underwater" or at times of floating in the water paralyzed and unable to signal to the vessel coming back to get him. During these nightmares, he jumps up and he states that he can be "rather violent" during them. On several occasions, he got out of bed and ran. On one of these occasions, he knocked over an exercise machine and injured his Achilles tendon and cracked a rib. On some occasions, he finds himself holding his breath, does not know where he is, feels confused, and cannot recognize his wife in bed. He states that he uses a night-light, and this helps him get reoriented if he awakens confused.

According to Mr. Brooks, when he got home from Rhode Island Hospital, he had tightness in his chest, trouble breathing, and collapsed a few days later. He was taken to Falmouth Hospital, where he underwent bronchoscopy, staying there for four days. Mr. Brooks described what he recalled as the difficulties of this procedure in some detail. He reports that the nightmares began some time after he returned home from Falmouth Hospital, and that they have not changed in frequency. The most common nightmare is of being pulled down suddenly, hearing the engines, seeing the propeller, and needing air. He also has dreams of being towed by the ankle by a vessel, but being able to reach up and look at the people along the rail of the vessel, who have no expressions on their faces. Dr. Forrister's note of May 18, 2006 indicates that he was "having some pleasant dreams " at that point and "continues to improve—more confident." In his note of June 29, 2006, Dr. Forrister wrote that Mr. Brooks' symptoms had decreased on his current medications and that he was having "frequent nightmares, but less violent."

In addition to the nightmares, Mr. Brooks states that he occasionally will have flashbacks of drowning while driving his car. He has had to pull his car over due to an asthma attack, and keeps his asthma medication with him at all times. He becomes short of breath, and he feels panicky and "almost yells for help." He notes that one of his asthma medications makes his heart race.

Following the accident, Mr. Brooks states that he lost interest in things, such as fishing, and that this had continued to the time of our meeting. He was doing some fishing from the shore, wearing waders and a life vest, and quitting if he stepped in a hole or tripped. Mr. Brooks states that he has a fear of water and can no longer kayak, noting that one of his doctors told him that it would be very serious if he "got another shot of water" in his lungs. He had been on the ferry once since the accident, solely for the purpose of retrieving his fishing gear from hi locker. He stated that he has been on no other boats and has not been to Martha's Vineyard. Mr. Brooks stated that he does not want to be pushed to do things, noting that friends have told him they are just going to put him in a kayak and that he will be fine.

Mr. Brooks stated that he used to bicycle, but lost interest after the accident. He stated that he became depressed after the accident and that his mood varies. In the morning, he can fight his way out of feeling depressed by making the bed and washing the dishes, so that he feels he accomplished something. On other occasions, after having nightmares, he lies in bed for two days, feeling "out of it," not wanting to be around people and with the telephone unplugged. He had also lost interest in sex.

According to Mr. Brooks, he has difficulty falling asleep and staying asleep. He ends up sleeping on the couch during the day. His psychiatrist prescribed Remeron, an antidepressant, to help him sleep. He was seeing the psychiatrist, Dr. Forrister, approximately every five weeks. If he feels depressed or panicky during the day, Mr. Brooks takes clonazepam 1 mg twice a day. He states that he felt "on edge, all day, every day." Walking helped relieve his anxiety.

Mr. Brooks also described having low energy since the accident, where it used to be very high. He stated that he feels helpless and hopeless at times, when lying in bed after a nightmare. He felt that his wife was very understanding. She was working at Filene's at the Cape Cod Mall, but he had not felt well enough that he could be counted on to work. Instead, he performs chores around the house.

Mr. Brooks reported that his concentration is poor and that he can no longer follow the plots of movies he is watching. He noted that he had difficulty concentrating on the World Series when the Red Sox were in it. He did not watch the news, and last focused on the news when the tsunami hit Indonesia, because he knew how people felt. He did not read books or magazines, where previously he read technical journals and newspapers, and avoided reading bad news.

While he denied hallucinations, Mr. Brooks reported hearing his name being called from upstairs at the house, and that this occurred before the accident, but has increased since then. He described increased startle response and being bothered by the sound of ambulance sirens. Loud noises made him anxious. For example, the previous summer he found that he would jump whenever his air conditioner turned on, because it "sounded like the wheel of the vessel turning." Mr. Brooks reported that he was irritable, primarily with his wife "over stupid things." This made him angry with himself for not having more control. He kept the shades pulled down at home, where he used to enjoy having light in the house.

Mr. Brooks felt that he had been given extra time in his life. He is thankful for Mark Laliberte, whom he describes as a shipmate but not a friend. He noted that Mr. Laliberte initially came around frequently after the accident and filled him in on what had happened. He gradually drifted away, however. Mr. Brooks stated that he did tell Mr. Laliberte "a couple of times" that he would Mr. Laliberte not come around, as going back over the events made him feel sick.

Mr. Brooks reported that he went through a great deal sitting through the Coast Guard hearing. Listening to the captain testify, he had mixed emotions, alternating between anger and feeling sorry for him. He noted that the captain is back sailing and had left a telephone message for him once, asking how he was doing.

Mr. Brooks noted his surprise that he was able to talk about the accident in detail with me, and he speculated about how it would affect him that evening. Dr. Forrister's note of January 12, 2006 indicated that Mr. Brooks had "Handled an interview with defense psychiatrist well." However, Dr. Darbyshire's note of March 4, 2006 indicated that Mr. brooks could not stop thinking about the meeting with this evaluator, and that it had "rekindled thoughts of the trauma and feelings of paranoia." He was described as managing these feelings.

When asked about symptoms of posttraumatic stress disorder (PTSD), Mr. Brooks endorsed virtually every possible symptom. These included recurrent intrusive thoughts, dreams and nightmares, emotional distress when exposed to reminders of the accident, flashbacks, and physiological reactivity to internal and external cues. He reported avoiding thoughts and conversation about the event, avoiding people and places that remind him of the accident, decreased interest in previously enjoyed activities, inability to recall aspects of what happened, feeling detached form family, and having a restricted range of affect. Finally, Mr. Brooks reported difficulty falling asleep, irritability, difficulty concentrating, hypervigilance, and an exaggerated startle response.

Mr. Brooks stated that he has had memory problems since the accident, resulting in him losing things. He reported that his wife will say something to him, he will respond "yeah" but then says the wrong thing when she asks him what she said. He attributed this to his "mind being off" or to thinking about the accident. He stated that he dissociates when he is driving, missing exits or the way to the doctor's office. He has had one minor accident and cannot figure out whose fault it was.

Mr. Brooks also reported having panic attacks the day after he has a nightmare. These can be triggered by thinking about the accident or difficulty breathing. The panic attacks involve a sense of doom, intense anxiety, sweating, palpitations, and a need to flee wherever he is. Mr. Brooks stated that smoke and finger nail polish trigger his asthma, and that his pulmonologist has told him that the drowning rekindled his childhood allergies and asthma.

According to Dr. Darbyshire's notes, Mr. Brooks experienced increased symptoms in April of 2006 as a result of talking with his former coworkers, the legal proceedings, and his wife buying a kayak. One week later, he reported distress after watching a simulated drowning on the Discovery Channel. In his note of May 18, 2006, Dr. Darbyshire noted that Mr. Brooks' attitude was "more positive." In subsequent notes, Dr. Darbyshire indicated that Mr. Brooks was experiencing some paranoid thoughts about investigators following him and the legal case. On June 16, 2006, Dr. Darbyshire wrote that Mr. Brooks felt he had to "keep vigilant ...I have to keep remembering the accident." Dr. Darbyshire noted that Mr. Brooks was experiencing reactivation of his traumatic memories as a result of the legal proceedings. On June 28, Dr. Darbyshire wrote that Mr. brooks had increased PTSD symptoms in response to heavy rainfall and the high level of water in his pond, which triggered fears of flooding. One week later, Mr. Brooks reported worries that his house was sinking. On July 12, 2006, however, Mr. brooks reported that he forgot about the accident sometimes.

In his note of August 11, 2006, Dr. Forrister indicates that Mr. Brooks was having "occasional nightmares. Anxiety during the day responds to relaxation and clonazepam. Sleeping fairly well—occasionally takes ezopidone. Much more positive, optimistic attitude present." He wrote that Mr. Brooks "continues to improve." According to the note of September 21, 2006, Mr. Brooks' anxiety increased in anticipation of his deposition but that his symptoms were well-controlled. At the appointment on November 3, 2006, Mr. Brooks was described as functioning well in spite of exacerbations of his anxiety, "depressed mood at times; Intermittent nightmares." Dr. Forrister noted that Mr. Brooks' symptoms were reduced with medications.

On December 14, 2006, Dr. Forrister indicated that Mr. Brooks "continues to be deeply involved in home improvement/organizing his basement—preoccupied with safety features. Overwhelmed at times—good relief with clonazepam. Denies feeling depressed; occasional nightmares." On January 26, 2007, Dr. Forrister indicated that Mr. Brooks reported "occasional triggers (action movies) and nightmares but recovers more quickly. Less irritable with wife. Denies depressive symptoms. Thinking about working towards employment in the future. Appears more relaxed."

It should be noted that no treatment records were available to me after January 2007.

7

Social History:

Mr. Brooks and his wife were married in 1986. They have no children. He denies any history of legal difficulties.

Medical History:

Mr. Brooks states that he has suffered shortness of breath, respiratory attacks, and nightmares as a result of the accident. He denies any serious medical illness prior to the accident in question. He was in a motor vehicle accident 16 years earlier that reportedly resulted in bulging intervertebral disks in his neck. This was not treated surgically. Mr. Brooks was out of work for 3 years following that accident as a result of his injuries. His medications at the time of our interview included: Singulair, Pulmicort, Foradil, Astelin, Nasonex, Xopronex, clonazepam, Remeron, Effexor, Nexium, and Lunesta. Remeron and Effexor are antidepressants.

Past Psychiatric History:

Following the motor vehicle accident described above, Mr. Brooks saw a therapist, Tom Stackhouse, to talk about the decision as to whether or not to have surgery. He returned to see that therapist some years later when he was having financial difficulties. At his deposition, he indicated that he saw the therapist due to the conflict with his partners over the whale watch venture and the ensuing financial difficulties. He also indicated that he had broken up with his girlfriend (now his wife), his dog had died, and Marine Research had gone out of business. Mr. Brooks indicated that he felt nervous, was fearful of one partner, and had difficulty sleeping during this period. He states that he recovered from both those episodes of depression. Also at his deposition, Mr. Brooks reported that he "may have gone over to Cape Cod Hospital for one day and then left."

At our meeting, Mr. Brooks described having depression throughout his life but his first treatment was around either the motor vehicle accident or the financial issues; he does not recall which came first. He does not recall if he took any medication on those occasions. At his deposition, he indicated that he had had bouts of depression ever since first seeing Tom Stackhouse. He also indicated that he thinks he tends to "react a little bit more than the average person and can get anxiety and depression from certain—from a situation and things that happen and maybe react a little bit more."

Similarly, Mr. Brooks could not recall if his primary care physician, Dr. Dietz, had provided him with medication for depression or anxiety. He did not recall if Dr. Dietz had referred him to a psychiatrist or a psychologist prior to the accident, but states "that doesn't mean he didn't." At his deposition, he initially testified that Dr. Dietz treated him for insomnia after he started working on the whale watch boats, but could not recall being treated by him for anxiety or depression. Later in the deposition, he testified that Dr. Dietz had treated him for "anxiety and a little bit of –and—and depression from lack of sleep on the boat." At our meeting, he did not recall seeing a Dr. Alexander, but at his deposition he indicated that he saw Dr. Alexander in 1993 or 1994 after he had been

turned down for a series of jobs. He testified that he went to Dr. Alexander looking "for a sense of direction as to how I could better present myself." Also at his deposition, Mr. Brooks testified that he saw another therapist, a Dr. Dimitri, for pain management after his motor vehicle accident.

According to Dr. Dietz' records, Mr. Brooks was treated for "reactive depression" in September 1989 after a motor vehicle accident. The depression was noted July 1990 and he was prescribed Pamelor, an antidepressant, on July 20. He reportedly had adverse side effects from this, e.g. "feeling more depressed, agitated, angry. Wants to argue with everyone." The Pamelor was discontinued and subsequently restarted. Mr. Brooks' depression is noted into August 1991, and Dr. Dietz referred him for inpatient hospitalization at Beth Israel Hospital. On August 29, 1991, Dr. Dietz noted that Mr. Brooks was having recurrent episodes of anxiety, which he speculated might be related to the possibility of surgery. Mr. Brooks never followed up on the Beth Israel referral, but did get approval to see Robert Dimitri, Ph.D. in Sandwich for two visits.

By December 11, 1992, Dr. Dietz described Mr. Brooks as suffering from anxiety. In the next note, dated June 28, 1993, he is reportedly felt well. The note of May 3, 1994 states that Mr. Brooks was experiencing recurrent depression and insomnia. Dr. Dietz prescribed Paxil, and antidepressant, and clonazepam. Mr. Brooks had apparently seen a Dr. Ianzito for a psychiatric consultation and was awakening in the morning "with overwhelming feelings of depression."

Dr. Dietz noted that Mr. Brooks was "Under stress with neighbor. Has an illegal outhouse. Can't deal with town. Has to go to public hearing. Spoke with an attorney. Can't afford legal fees. Was found by his wife outside, muttering, making no sense." He diagnosed Mr. Brooks with depression and acute anxiety neurosis and referred him to a psychologist, Dr. Alexander.

On February 28, 1995, Dr. Dietz diagnosed Mr. Brooks as suffering from recurrent depression. He prescribed Prozac and renewed the clonazepam, and Mr. Brooks complained of nausea from the Prozac during March. In November, 1996, Dr. Dietz diagnosed Mr. Brooks with "chronic anxiety." As of March 20, 1997, Dr. Dietz was treating Mr. Brooks with clonazepam for insomnia.

Subsequent records indicate that Mr. Brooks continued to be treated for anxiety and depression by Dr. Dietz. His symptoms waxed and waned over the years, with various antidepressants prescribed. In May 2001, Dr. Dietz diagnosed Mr. Brooks with chronic depression, which was noted again in March 2002. He was noted to be suffering from anxiety and insomnia in February 2003, and at the time of the accident, Mr. Brooks was taking clonazepam, an anti-anxiety medication, and Ambien, a sleep medication, on alternate nights.

Current Psychiatric Treatment:

At the time of our meeting, Mr. Brooks was in treatment with Jack Darbyshire, Ed.D., whom he was seeing once a week. The treatment consisted of psychotherapy with Eye Movement Desensitization and Reprocessing (EMDR). He saw Dr. Forrister for medication management approximately every 5 weeks.

Substance Use:

Mr. Brooks does not use tobacco products or recreational drugs. He reports that he drinks a beer "occasionally."

Family Psychiatric History:

Mr. Brooks denied any family history of mental illness.

**Mental Status Examination:**

Mr. Brooks appeared on time for the interview. He was casually dressed; no abnormalities of gait were noted, however he exhibited a slight hand tremor. He was initially anxious but calmed considerably after approximately 15 minutes. He had no difficulty describing the events in question and at no time evidenced symptoms of panic or dissociation. His affect was normal in range and intensity; his speech was normal in rate and tone. Mr. Brooks was readily engageable and was cooperative. He described a variety of symptoms, as described above. He denied any symptoms of psychosis and none were evident. He complained of mild cognitive difficulties but denied major memory problems. On the Mini Mental State Examination, Mr. Brooks was unable to name the day of the week or the season. He had to be prompted to follow instructions and made a single major error on serial subtraction.

**Conclusions:**

Mr. Brooks is currently a 59-year-old man who suffered near drowning during the course of a man overboard drill on the M/V Islander on August 4, 2003. Prior to this incident, Mr. Brooks had a history of chronic depression consistent with Dysthymic Disorder and Major Depression, Recurrent, and Anxiety Disorder NOS, for which he received treatment by his primary care physician, and he was in treatment for anxiety and insomnia at the time of the accident. Mr. Brooks has filed suit against the Steamship Authority alleging, in part, that he suffered emotional damages as a result of the accident.

Mr. Brooks described the events leading up to the near drowning in detail and was able to do so in a calm and clear manner. He recalled the lifeboat capsizing and being in the water, with his head above water. He then described being pulled under water and a series of distressing thoughts until he lost consciousness. Since the near drowning, he

has had a variety of psychiatric symptoms, as noted above. Some of these represent a continuation of pre-existing symptoms.

I offer the following opinions, with a reasonable degree of medical certainty.

1. As a result of his near drowning, Mr. Brooks suffered an exacerbation of his chronic depression and anxiety and developed Posttraumatic Stress Disorder.

2. Based upon the information available to me, it appears that Mr. Brooks meets the criteria for the following DSM-IV TR diagnoses:

| | |
|---|---|
| Axis I: | Posttraumatic Stress Disorder, Chronic, in partial remission |
| | Major Depression recurrent, in remission |
| | Dysthymic Disorder |
| Axis II: | Deferred |
| Axis III: | Chronic allergies, multiple somatic symptoms, post-water inhalation pulmonary damage |
| Axis IV: | Exposure to traumatic situation |
| Axis V: | GAF 65 |

3. Based upon my review of Mr. Brooks' available medical and mental health records, and my examination of him, it is my opinion that he reached a point of maximum medical improvement within approximately 6 months of my interview of him. To the extent that he has continued to suffer symptoms, this appears to be related to the litigation process exacerbating his pre-existing symptoms and his PTSD symptoms. It should be noted, however, that I have not had access to treatment records subsequent to January 2007.

4. It is also my opinion, based upon these materials, that Mr. Brooks should be capable of some gainful employment at this time.

Thank you for asking me to evaluate Mr. Brooks. Please feel free to contact me if you have any further questions.

Respectfully submitted,

*Ronald Schouten*
Ronald Schouten, MD, JD

**PLAINTIFF'S EXHIBIT "B"**

```
 1                              Volume: I
 2                              Pages:  1-228
 3                              Exhibits: 40
 4           UNITED STATES DISTRICT COURT
 5           DISTRICT OF MASSACHUSETTS
 6     _____
 7     BARRY BROOKS,
 8                  Plaintiff
 9          vs.                            Docket No.
10     WOODS HOLE, MARTHA'S VINEYARD AND   05-11224-MLW
11     NANTUCKET STEAMSHIP AUTHORITY,
12                  Defendant
13     _____
14
15           DEPOSITION of RONALD SCHOUTEN, M.D.,
16     J.D., a witness called by and on behalf of the
17     Plaintiff, taken pursuant to the Federal Rules of Civil
18     Procedure, before Cynthia F. Stutz, Certified Shorthand
19     Reporter and Notary Public in and for the Commonwealth
20     of Massachusetts, at the offices of Latti & Anderson,
21     LLP, 30-31 Union Wharf, Boston, Massachusetts, on
22     Wednesday, August 1, 2007, commencing at 10:07 a.m.
23
24
```

Page 202

1  A. That's it.
2  Q. In your report dated April 30, 2007 did you
3  write -- How soon was that after you interviewed him?
4  You interviewed him --
5  A. It was quite a ways. I waited for the
6  deposition testimony.
7  Q. I see.
8  A. I think I was still hopeful we were going to
9  get some medical records from days of yore.
10 Q. Okay. And were any of those medical records,
11 was any of those acquired or tracked down, to your
12 knowledge?
13 A. The ones from a long time ago, Stackpole.
14 Q. Do you know what the standard practice is for
15 private clinical psychiatrists or psychologists in
16 terms of keeping records?
17 A. I know psychiatrists are required to keep them
18 for seven years.
19 Q. Seven years?
20 A. But many people keep them much longer.
21 Q. I see, I see. Is that unusual that it's
22 difficult to get old psychiatric records?
23       MR. CHIARELLO: Objection.
24 A. It depends who you're dealing with.

Page 203

1  Q. But at any rate, you, based on your interview
2  of Mr. Brooks, you believe that he, prior to any of
3  these events, had a prior psychiatric illness?
4  A. Yes.
5  Q. And that be would anxiety and depression?
6  A. Correct.
7  Q. At the time of his accident Mr. Brooks was no
8  longer being treated for those two illnesses, correct?
9  A. I thought his internist was still treating him
10 and certainly there's a comment by Dr. Dietz that his
11 mood was better or had been better, so he was clearly
12 getting clinical attention.
13 Q. But he was fully functional in terms of his
14 work and his relationships?
15 A. That's my sense.
16 Q. That as a result of this incident on the boat,
17 on the Islander, that tended to exacerbate or make
18 worse his preexisting depression and anxiety?
19 A. Yes.
20 Q. So that's sort of an aggravation of a
21 preexisting condition?
22 A. Correct.
23 Q. Do you believe that aggravation is permanent
24 in the sense that it's always going to be aggravated?

Page 204

1  A. No, I actually think that -- No, the answer is
2  no.
3  Q. Do you think that with regard to his anxiety
4  and depression, he'll return to his baseline at some
5  point in time?
6  A. I think with regard to his generalized anxiety
7  and depression he is at his baseline.
8  Q. Okay. Do you have an opinion as to when he
9  returned to his baseline with respect to his anxiety
10 and depression?
11 A. Yeah, I would say within six to eight months
12 after I saw him.
13 Q. Okay. With respect to the post traumatic
14 stress disorder, that is not an aggravation of a
15 preexisting condition, is that correct?
16 A. Correct.
17 Q. That was caused solely by this incident?
18 A. That's my impression.
19 Q. Your opinion is that, as I understand it, from
20 a psychiatric perspective, he is capable presently of
21 some type of work?
22 A. I believe so.
23 Q. Okay. As I understand your opinion, he is not
24 capable of returning to work as a merchant seaman in

Page 205

1  that same environment?
2  A. Correct.
3  Q. He would not be capable of conducting regular
4  man overboard drills?
5  A. I think that would be very difficult for him.
6  Q. And that inability to do that type of work is
7  permanent, as I understand it?
8  A. As I understand permanent.
9  Q. Okay. And permanent meaning it's forever?
10 A. And unlikely to, unlikely to recover.
11 Q. So Barry Brooks, as a result of this incident
12 on the Islander, he's never going to be able to go back
13 to the type of work he did before the accident,
14 correct?
15       MR. CHIARELLO: Objection.
16 Q. In your opinion?
17 A. I don't believe so.
18 Q. I'm sorry, I didn't hear?
19 A. I don't believe he can.
20 Q. Okay. And he's capable of doing some types of
21 work, correct?
22 A. Yes.
23 Q. Would his post traumatic stress disorder limit
24 his ability of the types of work that he would be

52 (Pages 202 to 205)



# CLINTON & MUZYKA, P.C.

ATTORNEYS AT LAW
ONE WASHINGTON MALL, SUITE 1400
BOSTON, MASSACHUSETTS 02108

THOMAS E. CLINTON
THOMAS J. MUZYKA
ROBERT E. COLLINS*
KENNETH M. CHIARELLO
TERENCE G. KENNEALLY

ARTHUR P. SKARMEAS**
Of Counsel

*Also admitted in RI
**Also admitted in NH

October 7, 2004

Gary Forrister, M.D.
27 Park Street
Hyannis, MA 02601

Attention: Custodian of Records

Re: Barry Brooks
29 Shady Lane
East Falmouth, MA
DOB: 11/08/47

Dear Sir/Madam:

Enclosed please find Authorization duly executed by the above named individual authorizing release of his entire medical records to this office. Would you kindly forward same to the above address and bill this office directly for any copying charges incurred.

Thank you for your prompt response to this request.

Very truly yours,

Kenneth M. Chiarello

KMC:cm
Enclosure

## HIPPA AUTHORIZATION FORM

I, BARRY BROOKS, hereby authorize Gary Forrister, 27 Park Street, Hyannis, Massachusetts 02601 to disclose my protected health information described below to **CLINTON & MUZYKA, P.C.,** One Washington Mall, Suite 1400, Boston, Massachusetts 02108.

My protected health information will be disclosed in connection with a demand for maintenance and cure benefits.

This authorization for disclosure applies to <u>any and all</u> medical records (office notes, physical therapy, speech therapy, occupational therapy, diagnostic films, operative notes, discharge and admission summaries, nurse's notes, etc.) or other related documents in the possession of Gary Forrister, M.D. including mental health, HIV, and substance abuse records.

I understand that I have the right to revoke this authorization, in writing, at any time by sending such written notification to the Custodian of Records for Gary Forrister, M.D., 27 Park Street, Hyannis, Massachusetts 02601. I also understand that my revocation is not effective to the extent that the persons I have authorized to use and/or disclose my protected health information have acted in reliance upon this authorization.

I understand that I do not have to sign this authorization. The recipient of this authorization does not have the ability to condition any treatment or payment on whether I sign this authorization.

I understand that information used or disclosed pursuant to this authorization may be subject to re-disclosure by the recipient and no longer protected by federal laws and regulations regarding the privacy of my protected health information.

This authorization expires on September 30, 2005.

I certify that I have received a copy of this authorization.

_____          _____
Signature of Patient or Personal Representative          Date

_____
Name of Patient or Personal Representative


_____
Description of Personal Representative's Authority